1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                - - -

    CHERVON (HK) LIMITED, CHERVON
4   NORTH AMERICA, INC.,                   :     CIVIL ACTION
                                           :
5             Plaintiffs,                  :
    v                                      :
6                                          :
    ONE WORLD TECHNOLOGIES, INC.,          :
7   TECHTRONIC INDUSTRIES CO. LTD.,        :
    HOMELITE CONSUMER PRODUCTS INC.,       :
8                                          :     NO. 19-1293-LPS
              Defendants.
9                                - - -

10                          Wilmington, Delaware
                         Thursday, January 7, 2021
11                         Telephone Conference

12                               - - -

13  BEFORE:     HONORABLE SHERRY R. FALLON, Magistrate Judge

14                               - - -

    APPEARANCES:
15

16            GREENBERG TRAURIG LLP
              BY:  BENJAMIN J. SCHLADWEILER, ESQ.
17
                     and
18
              GREENBERG TRAURIG, LLP
19            BY:  JAMES J. LUKAS, JR., ESQ.,
                   MATTHEW J. LEVINSTEIN, ESQ., and
20                 BENJAMIN P. GILFORD, ESQ.
                   (Chicago, Illinois)
21
                        Counsel for Plaintiffs Chervon (HK)
22                      Limited and Chervon North America, Inc.

23

24
                            Brian P. Gaffigan
25                          Official Court Reporter

1     APPEARANCES:   (Continued)

2
                    DLA PIPER LLP (US)
3                   BY:  BRIAN A. BIGGS, ESQ.

4                        and

5                   DLA PIPER LLP (US)
                         SEAN C. CUNNINGHAM, ESQ.
6                        ERIN P. GIBSON, ESQ.
                         (San Diego, California)
7
                         and
8
                    DLA PIPER LLP (US)
9                   BY:  DAMON M. LEWIS, ESQ.
                         (Washington, District of Columbia)
10
                              Counsel for Defendants One World
11                            Technologies, Inc., Techtronic
                              Industries Co. Ltd., and Homelite
12                            Consumer Products Inc.

13

14

15

16

17

18

19

20

21

22                            - oOo -

23                     P R O C E E D I N G S

24              (REPORTER'S NOTE:  The following telephone

25     conference was held remotely, beginning at 1:03 p.m.)

```
 1                    THE COURT:  Good afternoon, everyone.  This is
 2    Magistrate Judge Sherry Fallon joining the conference call
 3    in Chervon Limited versus One World Technologies, et al.
 4    This is the time set aside for a discovery dispute, and I do
 5    appreciate counsel adjusting the time to start this later
 6    this afternoon.
 7                    Let's start with appearances for the record.
 8    First, I need to confirm that I have a court stenographer on
 9    the line.
10                    THE COURT REPORTER:  Yes, Your Honor.  This is
11    Brian.
12                    THE COURT:  All right.  Thank you, Mr. Gaffigan.
13                    Do I have my law clerk, Ms. Polito, on the line?
14                    THE LAW CLERK:  Yes, Your Honor.  I'm on the
15    line.
16                    THE COURT:  Thank you.  All right.  Then let's
17    start with appearances on the counsel beginning with
18    Delaware counsel, starting with the plaintiff, Chervon (HK)
19    Limited.
20                    MR. SCHLADWEILER:  Good afternoon, Your Honor.
21    This is Ben Schladweiler from Greenberg Traurig on behalf of
22    the Chervon plaintiffs.  I'm joined today by James Lukas and
23    Matthew Levinstein, both from our Chicago office.
24                    MR. LUKAS:  Good morning, Your Honor.
25                    THE COURT:  Good morning, everyone.
```

1          MR. LEVINSTEIN:  Good afternoon, Your Honor.

2          THE COURT:  Yes, for me.  Thank you.

3          All right.  Okay.  Let me just make notes of who

4     is on the call.

5          All right.  And now for the defendants, starting

6     with Delaware counsel.

7          MR. BIGGS:  Good afternoon, Your Honor.  This

8     is Brian Biggs from DLA Piper on behalf of the defendants.

9     With me on the line are my colleagues also from DLA Piper,

10    Sean Cunningham, Erin Gibson, and Damon Lewis.

11         MR. CUNNINGHAM:  Good afternoon, Your Honor.

12         THE COURT:  Good afternoon.

13         MR. LEWIS:  Good afternoon.

14         THE COURT:  Good afternoon, everyone.

15         All right.  I have read what amounts to I guess

16    roughly 24 pages of arguments regarding a number of

17    discovery disputes and literally hundreds of pages of

18    exhibits that I received in a very short span of time from

19    January 4th.

20         I can't represent to all of you that I have my

21    arms around the exhibits in their entirety, so you can help

22    me on this dispute in a number of ways.

23         First of all, I'm asking for succinct and

24    direct argument specifically identifying what the moving

25    party claims is sufficient about the other party's discovery

1    responses.

2           I'm trying to cut through much of the background

3    information.  I understand what the nature of this patent

4    case is.  I understand there is a large number of patents,

5    the accused products, generally, very generally speaking

6    involve lawnmowers.

7           I do have an understanding from reading the

8    papers of much of the background and given the number of

9    issues we have to get through this afternoon, it's not

10   going to be helpful to have it proceed as if it were an oral

11   argument on summary judgment.

12          Let's go directly to the issues, the alleged

13   deficiencies and what each side has to say about them.

14          We'll go issue by issue.  I'll go in the

15   chronology that the briefs were filed, so we'll start with

16   the defendant One World's issues, vis-à-vis the plaintiffs

17   first.

18          And we'll go issue by issue within that

19   moving submission.  So we'll start, in other words, with

20   Interrogatory No. 8 and the alleged deficiencies in the

21   response and then when that is resolved; we'll move on to

22   Interrogatory Nos. 13 and 14, attempt to resolve those, et

23   cetera.  And we'll proceed in the same fashion with respect

24   to plaintiffs' issues.

25          And then at the conclusion of our conference

1    today, I'm going to make some rulings with respect to

2    management of the next discovery conference that we're going

3    to have on January 28th because I do not want to be in the

4    same position of having to manage such a large number of

5    disputes.  And by my count, looking at Document Items No.

6    126 and 147, which I believe are all plaintiffs' disputes,

7    there are essentially approximately 12 disputes teed up

8    already on that date.  And we're going to have to be more

9    efficient about that, but we can discuss that at the end of

10   the call.

11            So turning first to One World's issues and

12   Interrogatory No. 8.  Let me hear briefly on that point and

13   let me ask an initial question which may help streamline the

14   argument.

15            On the first page of Document Item No. 140, the

16   argument is made that, with respect to Chervon's response

17   incorporating the briefs that it filed with the PTAB, the

18   argument made by the defendants is that they cover only a

19   subset of the prior art charted by defendants in their

20   initial invalidity contention, and final infringement

21   contentions that were served.  And the conclusory argument

22   is that Chervon has not served any validity contentions

23   regarding most prior art charted by One World and that

24   therefore the response is "insufficient".

25            I have to say this tells me nothing specifically

1    about what specific deficiencies defendants are pointing to

2    that need to be corrected by the Court, by Order of the

3    Court, so please address that.

4              MR. LEWIS:  Your Honor, Damon Lewis for the

5    defendants.  I'll try to address it succinctly.

6              The one -- (inaudible) talks about Chervon

7    identifying each claim element that may contain prior art

8    references that the defendants represented to them.  So

9    when, when Chervon only gives us incorporation by reference

10   to the file given at the PTAB, they actually missed at least

11   five of the charts that we have provided them and therefore

12   have given us no claim-element-by-claim-element analysis of

13   at least five different prior art combinations we presented

14   to them.

15             We need to know from them what is deficient

16   about our allegations that these patents are invalid during

17   the fact discovery period by the expert discovery later on.

18             THE COURT:  First of all, just technical

19   difficulties.  You are sounding a little bit muffled, so I'm

20   not sure if you can rearrange the arrangement in a manner

21   you're addressing the Court.  I'll ask if everyone else who

22   is not speaking to put their microphones on mute, I'll put

23   mine on mute, all of you, so we don't have a lot of

24   background noise.

25             You are coming across a bit muffled.  I did hear

1    you speaking, but my question substantively is what, when

2    you mentioned five different prior art references in

3    combination, where are they identified for the Court in

4    this moving submission, Document Item No. 140?  And more

5    importantly, where have they ever been specifically pointed

6    out to the plaintiffs in any meet and confers or follow-up

7    emails to meet and confers?

8            MR. LEWIS:  Your Honor, I apologize for the

9    technical glitch.  I switched over to a speakerphone.

10           Can you confirm?

11           THE COURT:  That's better.

12           MR. LEWIS:  I sound better now?  Okay.

13           THE COURT:  Yes.  Go ahead.

14           MR. LEWIS:  Okay.

15           THE COURT:  Sorry, but I can't hear you.  I

16   don't know if you're on mute.

17           MR. LEWIS:  No, Your Honor.  I can begin.

18           So in our discovery letter of October 8th, we

19   informed Chervon that the answer to Interrogatory 8 was

20   insufficient, particularly noting that they don't explain

21   how any claim element was not rendered obvious by the prior

22   art disclosed by One World.

23           I would agree, Your Honor, that I have not given

24   them a reference-by-reference list of the art.  That was not

25   included in their response.  But I would represent to the

1    Court that it is readily knowable looking at the fact that

2    the response that Chervon provided was only to a subset of

3    the much more copious argument provided in the invalidity

4    contentions.

5            THE COURT:  All right.  I just want to confirm

6    for the record.  I think I know who is speaking.  It is

7    Mr. Damon Lewis; correct?

8            MR. LEWIS:  Yes, that is me, Your Honor.

9            THE COURT:  Okay.  And I'm sorry as I missed

10   it when you stated your name before you began your

11   presentation.

12            And I would ask that everybody, because we are

13   by telephone, even if it gets redundant, just please state

14   your name when you start to speak so the court reporter and

15   I have an accurate understanding of who is speaking.

16            So my question, Mr. Lewis is, how do you

17   expect the plaintiffs to correct the deficiency if you are

18   not giving them any type of notice of, hey, here is five

19   different prior art references, combinations of them that

20   we've included in our invalidity contentions, and you have

21   not addressed them?  You know, how are they to know how

22   you want them to correct this if it's not spelled out for

23   them?

24            MR. LEWIS:  Your Honor, thank you for the

25   question.  I believe that we have sought out for them

1    because we actually have given them a set of actual claim

2    charts for them to address, and they only addressed a subset

3    of these.  So we told them to address everything in the

4    chart.  They so far have refused.

5                THE COURT:  Doesn't some of this overlap with

6    opinions that will be expressed by experts?  And isn't the

7    idea -- well, let me just leave it there.

8                MR. LEWIS:  Yes, Your Honor.  I do believe

9    that there will be significant expert testimony on these

10   particular issues, but we are presenting our expert reports

11   first, and we'll be doing so in the blind with respect to

12   several of the charts that we provided to Chervon already.

13   Because we don't know what they believe is our deficiencies

14   in our charts.

15               What we're not asking at this point in time is

16   for them to provide us expert testimony.  The testimony that

17   was supplemented, that we're asking for.  So we believe that

18   Chervon is at the point where we're asking for a sneak peak

19   of expert testimony that is actually claimed.

20               THE COURT:  All right.  I will hear from

21   Chervon.

22               MR. LUKAS:  Good afternoon, Your Honor.  James

23   Lukas on behalf of Chervon.

24               I think the big issue is -- and I'm happy there

25   were some things clarified.  This is a situation, as the

1    Court is well aware, where the defendants filed nine IPRs.

2    So there is -- and we incorporate a lot of material from

3    those IPRs, a lot of briefing, a lot of applications, a lot

4    of expert testimony.  I want to say maybe 500-to-700 pages

5    of additional response to this Interrogatory No. 8.

6              I'm not aware of specific charts or prior art

7    that we do not address.  I can tell you that as is typical,

8    usually a defendant brings forth its most important art in

9    an IPR, and we have addressed all of those in this response.

10             I will say maybe just to kind of cut to the

11   chase, although not at issue here, they recently served,

12   defendants recently served final invalidity contentions.  We

13   are willing and plan to supplement our response to address

14   some new prior art that wasn't in the IPRs or the PTRs.

15   And to the extent there is any additional supplementation

16   required with respect to these unidentified charts or

17   combinations, we will also provide factual supplements at

18   that time.  And I think we can get that done definitely by

19   the end of -- within two weeks or three weeks.

20             And primarily to address the final invalidity

21   contentions which were not at issue in this discovery

22   response, but I figure, you know, why not just, if there is

23   anything else hanging out there, we will get them all the

24   factual response we can provide for prior art references or

25   combinations in two-to-three weeks.

```
 1                    I can give you, if you want me to give you -- I
 2       mean we can do it by the 28th, without a problem.  But I
 3       think what is really important, and I think we kind of
 4       clarified it now, is we will provide factual, any factual
 5       information we can provide in this response and not expert
 6       testimony.  This is -- most of this is obviousness analysis.
 7       I think all of it is, which, right, you know, involves
 8       expert testimony.
 9                    We don't have that expert testimony now so we
10       can't incorporate it or provide it there.  It's their
11       burden.  The patent claims are presumed valid.  And until
12       we get their expert testimony, we can't really provide any
13       responsive expert testimony.
14                    That being said, once that happens, and we do
15       provide responsive expert testimony, we'll also incorporate
16       that into a response later down the line.
17                    THE COURT:  All right.  Mr. Lewis, anything
18       further?
19                    MR. LEWIS:  Your Honor, if they're agreeing to
20       supplement and address all the charts, including the charts
21       we have added for our final contentions, then I believe this
22       does resolve the dispute with thanks to the Court.
23                    THE COURT:  All right.  I will order that this
24       dispute at this time is moot, and that I will expect the
25       plaintiffs will follow through with their representations
```

 1   today that they will supplement responses to address new

 2   prior art in the defendants' final invalidity contentions

 3   and correct anything that spills over potentially from this

 4   dispute at that time when they do that.

 5           And I will ask that that supplementation be

 6   done on or before January 28th.  And if, at that time, the

 7   supplementation has not been done, and we have our next

 8   teleconference on the 28th, the plaintiffs can be prepared

 9   to explain why it wasn't done or what additional time is

10   reasonably necessary to complete it, if it needs additional

11   time, which I hope it will not be in a position to need.

12   But in any event, I will expect that supplementation on or

13   before January 28th.

14           Let's move on then to the issues concerning

15   Interrogatory 13 -- well, let's do them separately, 13 and

16   14.  So let's address 13 first.

17           MR. LEWIS:  Yes, Your Honor.  Again, Damon Lewis

18   for the defendants.

19           Interrogatory No. 13 asks for Chervon to supply

20   a limitations-by-limitations explanation for how each of

21   their commercial embodiments meets the claims that they are

22   asserting.

23           So this is actually a part of a longer running

24   back and forth between One World and Chervon about marking

25   and ancillary items.  And we reach back to a discussion of

1    Interrogatory 2, which is not part of this dispute.  We can

2    see we got to where we are by increment.

3         And in responding to Interrogatory No. 2,

4    Chervon eventually gave us a response that they incorporated

5    into Interrogatory No. 13 that supplied a 130 page exhibit

6    explaining various features of a representative device and

7    how they may claim that it meets the patent limitations.

8         The problem with their disclosure is that it

9    is not actually legible because it does not give the weight

10   markers that you would expect in a claim chart or some

11   other kind of prose.  We asked them to produce an answer,

12   limitation by limitation, but Chervon's answer does not

13   actually include the limitations that this 138 page table is

14   discussing, and so it requires us to guess.

15        When we look at this chart --

16        THE COURT:  I have it in front of me.  I'm

17   actually looking at their second supplemental objections and

18   responses to first set of interrogatories, Interrogatory No.

19   2 which does attach that 138 pages.  Actually, Exhibit 1 to

20   Document Item No. 150, which goes along with their response

21   to this discovery dispute.

22        And to me, these are very detailed.  You know,

23   they're not -- granted, they're not in the two column format

24   potentially of a claim chart.  But, No. 1, you haven't cited

25   to me, defendants haven't cited any authority which requires

1    the plaintiffs to respond in that type of format.

2            Secondly, you haven't pointed out where any of

3    the deficiencies are in these 138 pages given the fact that

4    you have within these 138 pages images of the representative

5    Chervon products along with indications of where the claim

6    limitations are located on those products.  And, you know,

7    they're readily, the claims are readily searchable in the

8    patents-in-suit, so I'm not following where the specific

9    deficiencies are here.

10            MR. LEWIS:  Yes, Your Honor.

11            So One World is not asking that Chervon produce

12    an answer to the interrogatory in any particular format.

13    The format that they have chosen is very similar to a claim

14    chart which suggested to us that they were going to follow

15    that kind of traditional, but that is something that would

16    be responsive to this interrogatory.

17            And so we're not asking, though, to be

18    constrained to a traditional claim chart, but what we are

19    asking is that they actually identical the claim limitation.

20            The interrogatory asks for Chervon to identify

21    the limitation-by-limitation basis of how each limitation is

22    met.  I don't see how you can do that, Your Honor, without

23    actually telling us which claim limitation each page or each

24    cell was talking about, and so we are required to guess.

25            Now, some of these I admit will be easier to

1    guess than others.  For instance, on page 1 of 138, the

2    limitation in claim 1 of the '463 patent is a slide

3    triggered baking switch mechanism.

4           That is fantastic.  That drawing shows exactly

5    what we are referring to.  But if we go through other pages

6    on this document, the limitations are not readily apparent.

7    And so all we're asking for them to do is, you know, they

8    can start with this chart if they want to annotate it with

9    the claim limitation that they are referring to on this

10   page or they can produce some other way, whichever is most

11   efficient for them.  But what they have provided us so

12   far does not actually one inform the reader what claim

13   limitation on this limitation-by-limitation response they're

14   actually referring to on that page.

15          THE COURT:  Well, it seems to me similarly to

16   page 1 of 138, there are other pages throughout this exhibit

17   that do reference what appear to be claim limitations.  And

18   it would seem to me, as the moving party, claiming that

19   discovery is, that this is deficient, there is, at a bare

20   bones, the defendants should have collected what pages are

21   ambiguous or need clarification in order to give the

22   plaintiffs an opportunity to correct those pages because

23   obviously, as you said, page 1 doesn't need correction.  And

24   to the extent there are numerous or pages similar to claim 1

25   that arguably do not need correction, simply to come here

1    with a general request for a do-over, it seems to be

2    overbroad and unnecessary in light of the fact that the

3    defendants have admittedly been able to understand what

4    claim limitations are supposed to be represented in these

5    pages.

6              So, again, I'll ask, can you point me to any

7    exhibits that you supplied on behalf of the moving submission

8    that indicate that defendants asked the plaintiffs to clarify

9    ambiguous or otherwise unintelligible representations about

10   what claim limitations were supposed to be depicted in this

11   response?

12             MR. LEWIS:  I think, Your Honor, what I would

13   like to do is to offer to meet and confer with the others on

14   the other side so we can tell them exactly what pages we are

15   unable to determine are attached to particular limitations.

16             THE COURT:  All right.  And I would ask you to

17   do that promptly so that this issue does not carry over into

18   the discovery dispute on January 28th.  Thank you.

19             MR. LEWIS:  Yes, Your Honor.

20             THE COURT:  All right.  Let's move on to

21   Interrogatory No. 14, compliance with the patent marking

22   statute.

23             MR. LEWIS:  Your Honor, Damon Lewis for

24   defendants again.

25             So Interrogatory No. 14 is asking Chervon to

1    help us understand exactly how their 25 commercial

2    embodiments that they claim are marked by patent were

3    actually marked, how they were marked, and when they were

4    marked, and what percentage of the sales that Chervon

5    made from each of these commercial embodiments for such a

6    marking.

7            The focus of this interrogatory is on the

8    commercial embodiment.  We are asking Chervon to present

9    us information, embodiment by embodiment, that has this

10    information.

11            Chervon instead indicated in their response

12    information about particular patents.  Information about

13    particular patents is not particularly helpful because it

14    doesn't tell us what commercial embodiment was marked by

15    which patents and when and how many were sold that did or

16    did not have that information in an interrogatory.

17            So we're asking Chervon to, again, address this

18    focusing on the commercial embodiment and how it was marked

19    as opposed to when they began marking particular patents.

20            This is a particularly relevant interrogatory

21    because it speaks very strongly towards damages.  Under the

22    marking provisions of the Patent Act, Chervon is going to

23    be limited to damages for any infringement that they have

24    incurred before they began marking.

25            The marking also requires that the patentee that

sells these products marked essentially all the products

that they sell or have allowed to be sold on their behalf.

And so with respect to this interrogatory, this

interrogatory actually has the potential to severely limit

the damages or damages period for each of the nine patents.

THE COURT:  I understand the reason that you are

seeking it.  But again going back to my original request, if

you don't mind, specifically tell me what is deficient.

I'm going to hear I believe from Chervon,

because they said it in their papers that defendants haven't

identified any specific product that they believe to be

unmarked.  And in looking at this interrogatory response and

referring -- and for purposes of the record, I'm referring

to Document Item No. 141, which is the declaration that

went with defendants' moving submission, I'm looking at

Exhibit 4, pages 12 through 13.  And from what I can see

of these responses -- and you are free to point out if

I'm misreading them or misinterpreting them.  In terms of

the location where the marking appears on the product, it

appears that the interrogatory response satisfies that

portion of the request.

The time period during which each product

was sold with such marking from Chevron -- or, I'm sorry,

Chervon proposed on its letter submission, it looks like

it's willing to cure that alleged deficiency.  The

1    percentage of the product model sold with such marking

2    versus sold without such marking, again, they have

3    represented that its marked 100 percent of its newly

4    manufactured product as of the identified dates and have

5    continuously marked its newly manufactured products with

6    a patent as of those dates.

7            So again putting this all together from the

8    Court's view, it's hard for me to see specifically what the

9    deficiencies are.  And you have given me -- and I don't

10   dispute your recitation of the law with respect to patent

11   marking, but this is a discovery dispute.  You have got to

12   show me what is missing and ask how you would like the Court

13   to order it corrected.

14           MR. LEWIS:  Yes, Your Honor.

15           So the main deficiency here is that Chervon's

16   response is focused on the patent.  They marked something,

17   for instance.  They marked something with the '463 patent

18   since at least August 29, 2016.  What the interrogatory is

19   asking is which products that they sold or are allowed to

20   have sold were marked with the '463 patent.

21           They have not answered that.  They have not

22   answered that completely.

23           The background issue with respect to this

24   interrogatory is that Chervon has nine patents in this case,

25   and they were not issued all at the same time.

1                 Looking at just their commercial embodiments

2      known as the LM2100, which has been on sale for many years.

3      In fact, One World purchased one in February 2020.  So I

4      could analyze it ourselves.

5                 This product has been on the market I believe

6      since 2015.  And if I can say, and opposing counsel can

7      correct me, during the span of time that the 2100 has

8      been on the market, new patents have issued.  So this

9      interrogatory is asking, did you update the label on the

10     2100 to reflect the new patent?

11                Chervon's answer does not indicate that.

12     Chervon's answer only tells us that they started marking

13     things with the '463 on August 29, 2016, and they go through

14     the rest of the patent they allegedly had marked.

15                So if they failed to update the markings on

16     products that continue to be sold, then it has not marked

17     substantially all of the products.  So that is what this

18     interrogatory is seeking to get.

19                Now, they do, they explain that 100 percent of

20     the newly manufactured products as of the dates listed above

21     were marked.

22                That is actually unhelpful.  The product -- I'm

23     sorry.  The marking requirement doesn't care so much about

24     when a product was manufactured but what was it marked with

25     when it was sold, when it was presented to the world, when

1    it was put on sale.

2             And so Chervon telling us 100 percent of duly

3    manufactured products were marked is not a marking -- is not

4    related to the requirements of 287.  And more importantly,

5    it's not responsive to the interrogatories we've asked.

6             THE COURT:  But have you identified any

7    specific products on behalf of the defendants to Chervon

8    that defendants believe to be unmarked?  And if not, why

9    not?

10            If you feel, the client feels that it is not

11   their obligation to have to do that for purposes of seeking

12   discovery about them, then give me the legal authority that

13   you rely on for that.

14            MR. LEWIS:  Yes, Your Honor.  So Chervon

15   indicated for the first time that it was relying on the

16   *Arctic Cat* case to shift the burden to One World in its

17   motion response that was submitted to Your Honor.  That was

18   the first time that Chervon indicated to us that it wanted

19   us to point out any deficiencies in the marking before they

20   would answer this interrogatory fully.

21            That could be easily answered.  For one, they

22   have produced at the Bates numbers that are listed on page

23   12 of their response several marking labels, and these

24   labels include other things like for purposes of discussion

25   include markings of patents.

1          They include, at Chervon 4818, and 4819, labels

2     that were applied ostensibly to the LM2100 that I referred

3     to earlier.  Those markings end in 2017.  But the 21 -- I'm

4     sorry, the LM2100 continued to be on sale for years after

5     that, including the copy we purchased in 2020.

6          So there is a prima facie case presented by

7     their own documents.  And if they fail to update the

8     markings on the 2100, then they have not complied with the

9     Section 287.

10          If they had informed us that this was the

11     information still awaiting for us to share with them, we

12     could have shared it with them at that point in time.

13          THE COURT:  Let me hear from Chervon.

14          MR. LUKAS:  Thank you, Your Honor.  Good

15     afternoon.  James Lukas again for Chervon.

16          I'm going to -- I'm even more confused than I

17     was earlier.  We believe Chervon's response is more than

18     sufficient.  It goes through and talks about the products

19     that are embodiments by incorporating Interrogatory Nos. 1

20     and 4.  1, you know, it's talking, 1 lists all the

21     embodiments, I think, or the sales, dates and times, and

22     then 4 I think lists all the embodiments.  And it tells them

23     when the products were started to be marked.  You know,

24     everything that was manufactured.

25          I was really confused about manufactured versus

1    sold.  When they were manufactured, I mean I don't know if

2    there is some accusation that they were removed after they

3    were manufactured but before they were sold, but we haven't

4    heard anything about that.

5            The point is we think this is more than, more

6    than sufficient to respond to those interrogatories.  We

7    did offer to actually add the dates from the incorporated

8    document just to make it more, you know, more detailed, and

9    we will do that.

10           The one thing I'm a little confused about, I

11   think there is some confusion about the law.  Marking only

12   deals with pre -- the pre-notice period, so that might be a

13   part of defendants' confusion.

14           So really all that matters is what was marked

15   by the patents that were issued at that time and before we

16   ever filed suit.  That's all that matters because once we

17   filed suit, you know, they're on notice.  So it's all that

18   pre-notice period.

19           So I think we're talking about from when they

20   started, we started, patents were issued, the first patent

21   was issued in suit to the date of the first -- of the

22   lawsuit or the amended complaint.  I think the lawsuit.

23   Excuse me.  So that, yes, I think that kind of clears that

24   legal confusion.

25           But, again, you know, we do bring up that it's

1    their burden.  I think we have done, defendants -- excuse

2    me.  Plaintiffs have done more than enough to respond to

3    this.  We are willing to add dates of first sale to the

4    agreement -- excuse me, to the supplemental response.  And

5    we can do that by the 28th.

6                    THE COURT:  Thank you.

7                    Anything further, Mr. Lewis?

8                    MR. LEWIS:  Yes.  I'm actually not sure that

9    Chervon's suggested supplement is helpful in any way.  Maybe

10    -- I'll leave it at that.  I'm not sure what they have

11    suggested.  For one, yes, Chervon is trying to -- well, they

12    have alleged that they complied with the marking statute in

13    order to get damages from before the complaint.

14                    If their evidence is only from 2016 and 2017 and

15    there is a two year gap from 2017 until when they filed the

16    complaint in 2019 for which there is no evidence that they

17    marked, say, the 2100 with several of the patents-in-suit,

18    we need to know that.  And that is what this interrogatory

19    is asking.

20                    Secondly, the date of first sale, they have

21    already supplied that first via other discovery responses.

22    That is not what we're asking here.  We're not asking for

23    when the product was sold.  We're asking for at each point,

24    at each period of time that the product was sold where

25    there was a patent in force, was it marked on that product?

1      So Chervon suggested that they will supplement

2  to add dates on which the products were first sold.  They

3  have not centered this response on the 25 commercial

4  embodiments that they claim to have and what various marking

5  those 25 commercial embodiments exhibited for what period,

6  and whether or not that's the total number of sales that

7  they have for that embodiment as to substantially all of the

8  marked product.

9      I actually said that backwards.  I don't think

10  that they have addressed at all whether the products that

11  were marked when a patent was in force covered substantially

12  all the products that were sold during that period.

13      MR. LUKAS:  Your Honor, just can I just briefly

14  respond?

15      THE COURT:  You may briefly respond.  It may

16  help me.

17      MR. LUKAS:  Yes, Your Honor.  I think what is

18  happening is I think the defendants are trying to make some

19  type of, maybe it's a summary judgment legal argument, and

20  want us to respond to it in a discovery response that isn't,

21  you know, doesn't request that kind of information.

22      We fully responded to the interrogatory we

23  believe.  I'm very confused as to what additional information

24  we can provide, so I don't know if that helps, but ...

25      THE COURT:  All right.

1              MR. LEWIS:  Your Honor?

2              THE COURT:  Very briefly, Mr. Lewis; and I'm

3    ready to make a ruling on this.  Thank you.

4              MR. LEWIS:  All right.  So the *Arctic Cat* case

5    we have been discussing is actually pretty clear.  That

6    marking is something that is within the province of the

7    patentee.  It is something that the patentee would know

8    that the accused infringers were on notice.

9              So it is very incumbent, if we were ever to

10   produce a summary judgment motion on this, that Chervon

11   give us as full of an answer they possibly can for this

12   interrogatory to show their product was marked with all the

13   patents that this patent claimed to practice at every period

14   of time when the patents were in force.  Their answer is not

15   doing that right now.

16             THE COURT:  All right.  Having read the briefing

17   and heard the arguments of counsel on this, I'm going to

18   deny the motion to compel in part and grant it in part

19   with respect to the portion that Chervon indicated in its

20   answering submission that it was willing to supplement.

21   I will order Chervon to supplement its response to this

22   marking interrogatory, Interrogatory No. 14 by providing

23   a list that first sale dates for each of its commercial

24   embodiments and confirming that each of those commercial

25   embodiments were marked with patents that they practice, and

1    to do that on or before January 28th.

2            With respect to the overall relief that the

3    defendant is seeking in term of a response to the

4    interrogatory, I agree that as Chervon pointed out this is

5    sounding more in the nature of a summary judgment or legal

6    argument to me rather than a discovery dispute issue.

7            You're wanting to hear from -- defendants want

8    Chervon to make a legal argument with respect to application

9    of the application of the patent marking statute rather

10   than discovery.  And as the Court indicated on this record,

11   I've looked at their discovery responses and feel satisfied

12   in reviewing them that they have answered the pertinent

13   information with location of marking, percentage of product

14   models sold.  The only thing potentially lacking is

15   supplementation of a time period during which each product

16   was sold with the marking and they're willing to do that and

17   supplement as I have ordered.

18           So on that basis, my ruling stands.

19           And let me just state for the record now so I

20   don't have to keep repeating it:

21           All the rulings I make today with respect to the

22   discovery disputes are going to be bench rulings such that

23   the transcript will serve as the Order of the Court.  I

24   won't be issuing a separate written order to go along with

25   this conference.

```
 1              Therefore, the parties are subject to Rule 72(a)

 2   with respect to the time frame for taking timely objections

 3   up to the District Judge on any of my orders today.  And the

 4   District Judge will review them pursuant to Rule 72(a) of

 5   the Federal Rules of Civil Procedure to determine whether

 6   they're clearly erroneous or contrary to law.

 7              So with that, I think that satisfies all of the

 8   issues that were briefed in the letter briefing that was

 9   submitted by the defendants, or -- yes, by the defendants

10   with respect to alleged deficiencies in the plaintiffs'

11   interrogatory responses with respect to Interrogatories 8,

12   13, and 14.

13              I will now turn over to the next discovery

14   dispute that was chronologically briefed in the letter

15   briefing format.  And those are the disputes that the

16   plaintiff raised against Chervon -- I mean against defendant

17   One World with respect to the previous court order on the

18   parties' stipulation resolving a prior discovery dispute.

19   At least, that is the first issue that was raised.  So let

20   me know who will argue that on behalf of the plaintiffs.

21              MR. LEVINSTEIN:  Good afternoon, Your Honor.

22   This is Matthew Levinstein.  And I will be arguing on behalf

23   of the plaintiffs.

24              THE COURT:  Very well.  Just give me a moment to

25   grab those documents, of which I have hard copies.  It's
```

| | |
|---|---|
| 1 | easier for me to work with the hard copies when we're doing |
| 2 | this telephonically, so just give me a moment. |
| 3 | MR. LEVINSTEIN:  No problem.  I'm doing the same |
| 4 | thing electronically right now. |
| 5 | (Pause.) |
| 6 | THE COURT:  All right.  I have them in front of |
| 7 | me.  Thank you. |
| 8 | MR. LEVINSTEIN:  Thank you, Your Honor.  And I |
| 9 | will endeavor to be brief because I know we have a lot of |
| 10 | issues to get through. |
| 11 | So this one is a little bit different than the |
| 12 | other issues in that we already have a court order which was |
| 13 | an agreed-to stipulation about what defendants would agree |
| 14 | to produce in response to a series of document production |
| 15 | requests relating to two -- or a standard, a lawnmower |
| 16 | safety standard and the appropriate CFR regs related to |
| 17 | walk-behind lawnmower safety standards. |
| 18 | I won't go through the details, this is all in |
| 19 | the brief, of how we got to the point where the Court issued |
| 20 | its order.  But in response to that order, here is what we |
| 21 | received so far. |
| 22 | We received approximately 1,000 different |
| 23 | Consumer Product Safety Commission compliance audit reports. |
| 24 | We received 270 of them by the time the Court issued -- in |
| 25 | accordance with the deadlines of the Court, and then we |

1     received about 800 a month later.  Mostly, those are the

2     types of documents that we have received.

3                 As you can see from -- you know, nothing in

4     the Court's Order limits the production that defendants

5     expressly agreed to to adjust CPSC audit reports.  And I can

6     give you an example of that.  And we put this in our brief

7     relating to presentations, reports, memos, meeting minutes,

8     et cetera, that relate to regulatory compliance.

9                 That would encompass more than just the CPSC

10    audit.  So, for example, perhaps there was communications or

11    discussions between two defendant employees about any

12    particular CPSC audit or making sure that a certain accused

13    product was compliance with, you know, certain standards or

14    certain regulations that are at issue here.  And we haven't

15    seen any of that.

16                And so that is the troubling part of all of

17    this is that it was clear from not only before the Court

18    issued its order but after the Court issues its order, after

19    the defendants already agreed to it, that they were going

20    to be providing documents in response to Requests For

21    Production Nos. 102 through 104 and 106 through 115 subject

22    to an agreed upon limitation, but nothing in that limitation

23    limited the documents to just these CPSC audit reports.

24                THE COURT:  All right.  Well, let me ask you

25    that what specifically is missing from the CPSC audit

1    report produced by those defendants that requires them to

2    produce, as you say, documents showing planning and

3    preparing for the auditing process, training materials, for

4    example, explaining or describing the auditing process to

5    employees?

6            What do you expect to find outside of these

7    audit reports that are not cumulative of all of the

8    information that these audit reports give you about

9    compliance with the standard and the CFR?

10           MR. LEVINSTEIN:  Sure, Your Honor.  And the

11   thing is, you know, obviously we don't necessarily have an

12   expectation of what we would receive because we don't know

13   what documents they have in their possession.  But, for

14   example, these CPSC audit reports list a series of, as you

15   might guess, testing requirements for various aspects of

16   lawnmowers.  And if there are communications or

17   presentations discussing the compliance with certain of

18   these standard or regulation requirements, that may give us

19   insight into how defendants are interpreting the structure

20   of their products, for example, that could potentially go to

21   infringement, that could potentially go to invalidity.

22           I think maybe, you know -- and this is perhaps

23   a little, a little half baked, but it would also possibly

24   go to damages as well as to understand how exactly they

25   interpret the various features of their products and what

1     purposes they serve, including whether or not they served

2     to comply with one of the required standards or regulations.

3               THE COURT:  All right.  And I'm looking at the

4     stipulation, and it indicates that the defendants shall

5     provide a response to Plaintiff Interrogatory No. 13 and

6     Requests For Productions 102 to 104 and 106 to 115 with the

7     following limitation:

8               "Plaintiff shall narrow the scope of each of

9     these requests to responsive information and documents

10    limited to the standards in CFR as they relate to the

11    accused products."

12              My question is in the course of fashioning and

13    agreeing to this stipulation, how did each side define for

14    the other, if it did, what is meant by responsive

15    information and documents?

16              I'll just leave that phrase out there.  How did

17    you define what that was?  Did you spell out, for instance,

18    for the defendants what was contemplated by Chervon that

19    they would produce beyond the audit report?

20              MR. LEVINSTEIN:  Well, certainly, Your Honor.

21    And I think a little context will help here.

22              The scope of the Request For Production 102

23    to 104 and 106 to 115, they set forth what we received.

24    And admittedly -- and which is why, you know, plaintiffs

25    ultimately agreed to this stipulation.  We agreed to

narrow those original requests which said something like,
for example -- and I'm just, this reflects Request For
Production No. 13:  "All internal documents, including
presentations reports, memos, and meeting minutes relating
to consumer safety and the accused products."

So, for example, the issue is with consumer
safety.  That is way broader than just the specific CFR reg
and the specific ANSI standard that is identified in the
stipulation.

So that narrowed the world of responsive
documents and information just to the internal documents
relating to consumer safety or, for example, the next RFP,
regulatory compliance, to just those standards, to just the
ANSI standard and the CFR standard and the accused products.

So in other RFPs, it might not have been
limited to just the accused products.  So in that sense, the
stipulation then brought the world of relevant products that
we're looking for the documents relate to only the accused
products.

And that is still clear, that is still true.  We
aren't looking for CPSC audit reports, for example, relating
to non-accused products.  We don't need communications or
other internal documents or presentations that specifically
talk about regulatory compliance of non-accused products.

We don't need presentations relating to the

1      accused products that are talking about a different standard

2      other than the ANSI standard or the relevant CFR reg, you

3      know, listed in the stipulation.

4                 THE COURT:  So my question is this:  So you're

5      competitors in this space, so plaintiffs must have an

6      understanding that discovery relating to lawnmower safety

7      standard is largely in the form of these CPSC audit reports.

8      And in light of that, didn't the plaintiffs talk to the

9      defendants about wanting more than the audit reports?

10                Even if not a single audit report had been

11     produced by the time you entered into this stipulation, and

12     maybe you ought to clarify that for me if there was, did you

13     have any of the defendants' audit reports at the time you

14     entered into this stipulation?

15                MR. LEVINSTEIN:  Your Honor, I'm not 100

16     percent sure that we did or didn't.  I think we did not.

17     Certainly, the vast majority were produced after that,

18     after the stipulation.  But in any event, we certainly did

19     discuss with defendants' counsel the other Requests For

20     Production that perhaps call for documents other than the

21     audit reports.  And that is listed in Request For

22     Productions 102 to 104 and 106 to 115.

23                THE COURT:  Well, why wasn't that spilled out

24     in the stipulation?  You have already had a dispute about

25     these interrogatories and Requests For Production being

1    overbroad.

2              You make the big step with one another of

3    successfully meeting and conferring to narrow it to

4    discovery related to lawnmower safety standards.  And,

5    again, I'm speaking very generally.

6              Why didn't you further narrow it in the

7    stipulation that it's got to be a document beyond the

8    universe of simply these CPSC audit reports that you are

9    looking and list the type of things that you're looking for?

10   Because as I read this responsive information and documents

11   limited to, as they relate to the accused product, that is

12   limited to the standard and the Code of Federal Regulations

13   relating to those safety standards and regulations.

14              That doesn't really tell the defendants or

15   prepare the defendants for a discovery dispute like this

16   where you tick off:  planning and preparing for auditing,

17   the auditing process, training materials, et cetera.  You

18   were very specific in your papers to the Court, but I'm not

19   reading that in the stipulation, and I can't imagine that

20   there wasn't a discussion of that.  And if there wasn't a

21   discussion of the granular types of categories of documents

22   plaintiffs were looking for, how could you truly expect the

23   defendants to comply?

24              MR. LEVINSTEIN:  Your Honor, respectfully, I

25   think that information is in the stipulation.  And that is

1        why we included a specific reference to the specific request

2        for production numbers that implicated the various types of

3        documents that plaintiffs were searching for as they related

4        to regulatory compliance and lawnmowers.

5                And the nature of the stipulation, the nature of

6        the narrowing was taking what we've requested in relation to

7        the standards and regulations and limiting those requests

8        just to one specific standard and/or I should say two:  one

9        specific ANSI standard and one specific CFR reg and the

10       group of the accused products narrowed from lawnmowers

11       generally.

12               So, respectfully, I do believe that the parties

13       were in agreement, and we did discuss that what we were

14       looking for is laid out explicitly in the Documents Request

15       For Production.

16               THE COURT:  All right.  Let me hear from

17       defendant One World on this.

18               MR. CUNNINGHAM:  Thank you, Your Honor.  And

19       good afternoon again.  This is Sean Cunningham for One World

20       for the defendants.

21               I think I want to start with three points.

22               No. 1.  I can confirm, Your Honor, that all of

23       the audit reports, which we attached an example of as

24       Exhibit 1 to our submission, Document Item 148, all of the

25       audit reports were produced after the parties entered into

1  the stipulation, and, in fact, that stipulation is what led

2  to that production.  So the 1,086 audit reports that we have

3  produced are post-stipulation.  So that is point 1.

4          Point 2 is there was no discussion of what I'll

5  refer to as these ancillary documents.  So the presentations,

6  planning documents, training documents, there was no

7  discussion of that at the time we entered into the stipulation

8  or for a period of time after that.  I believe the first time

9  we saw reference to these ancillary documents was in the

10  November time frame of last year.

11          And the proof of that, part of the proof of

12  that, Your Honor, is in the original briefing before Judge

13  Stark.  And I'm referring in particular to Docket No. 97

14  which was the plaintiffs' filing of the original dispute.

15          I don't see any reference to these specific

16  types of documents in that submission.  And I am not aware

17  of any discussion of these ancillary documents in the days

18  and weeks leading up to the entry of the stipulation.

19          So "responsive information and documents," which

20  is the phrase that the stipulation that you pointed counsel

21  to, we believe was -- were fully satisfied by the production

22  that we did make, which was not just the audit reports but

23  also the standards themselves.

24          So as Your Honor I think understands, the audit

25  reports fully respond to the interrogatory.  We haven't

1    heard much discussion of the interrogatory.  The

2    interrogatory asks for each product, whether it complies

3    with the standard, how it complies with the standard, and

4    when it complied with the standard.  So those three pieces

5    of information.

6              And the audit reports themselves answer all

7    three of those pieces of information.  They answer whether

8    -- and that's, by the way, Your Honor, the "whether" is

9    obvious because under the law, you cannot sell one of these

10   lawn mowers in the United States until you passed this

11   compliance testing.

12             So in order to sell a lawnmower in the country,

13   you have to comply with these audits.  So the "whether" is

14   answered by the fact the product is on sale.

15             But then the "how" is answered by the compliance

16   column, the green column in these audit reports, and each

17   specific test that is set forth in there.

18             And then the "when" is obviously there is a date

19   on each of these audit reports that shows when each product

20   passed compliance.

21             So we believe that our production in this regard

22   was utterly complete as to all of the these RFPs.  But I

23   want to make sure -- there is one point I want to make sure

24   doesn't get lost here.  And that is when they first -- after

25   we made this production and after we answered the

1   interrogatory, and after we had completed what we believe to

2   be our compliance with the stipulation, they then raised,

3   well, we want more.  We want these presentations, we want

4   planning documents, we want training documents.

5           We actually went back and searched for those

6   things and confirmed with nem that we do not have anything

7   further to produce that would be responsive to the RFPs at

8   issue.  And so we have confirmed for them that our

9   production in regards to this is complete.

10          And so for an issue like this that is at

11   tangential to a patent infringement case, that it doesn't

12   involved standard essential standard patents, doesn't

13   involve allegations of infringement that are based on these

14   safety standards, I submit to Your Honor that we have more

15   than satisfied our discovery obligations with respect to

16   this issue.

17              MR. LEVINSTEIN:  Your Honor, may I respond?

18              THE COURT:  You may respond, Mr. Levinstein.

19              MR. LEVINSTEIN:  Thank you, Your Honor.

20          I'm looking at Docket No. 97 as well.  And for

21   defendants to say that they had no idea we were seeking

22   these other documents, the first sentence under the first

23   heading, and indeed the first heading itself specifically

24   references the Request For Production at issue here:  102 to

25   104, 106 to 115.  They made it into the first discovery

1   dispute before Judge Stark.  They made it into the

2   stipulation.  For defendants to claim that they don't, they

3   didn't know that we wanted this, I can't understand how that

4   can be.  I'll leave it at that.

5           THE COURT:  All right.

6           MR. CUNNINGHAM:  And, Your Honor, I'm sorry.

7   To be clear --

8           THE COURT:  Briefly respond.  Sorry, go ahead.

9           MR. CUNNINGHAM:  To be clear, my point is there

10  is no reference in that letter to presentation.  There is no

11  reference in that letter to training material.  There is no

12  reference in that letter to planning material.  There is no

13  reference in that letter to communications about the

14  standards, which, by the way, would be governed by -- and

15  we'll get into this I'm sure later -- an email, an email

16  limiting the agreement the parties have in this case.

17          But putting that aside, there is no reference to

18  these specific types of ancillary documents in the letter to

19  Judge Stark.  And there was no discussion between the

20  parties about those documents until well after we had

21  completed our production.  And to be clear, we have

22  confirmed with them that we do not have any such documents.

23          THE COURT:  Has that been confirmed in a formal

24  response to the Request For Production in issue?

25          MR. CUNNINGHAM:  No, Your Honor.  It was done in

1    a meet and confer, but I am happy to issue supplemental RFP

2    responses that confirm that in writing.

3              THE COURT:  All right.

4              MR. LEVINSTEIN:  Your Honor, may I?

5              THE COURT:  Go ahead.

6              MR. LEVINSTEIN:  Matthew Levinstein again.

7              And I don't want to blow this whole issue up

8    because I think a lot of these same issues are going to come

9    up as we discuss the other aspects of plaintiffs' discovery

10   disputes.

11             But it's with this, you know, confirmation that

12   nothing else exists, and it's with this, well, they never

13   asked for A, B, C, D, E, F, G, H, I, J, K.

14             But that is not true.  We did ask for those,

15   and we did ask for those in our Requests For Production.

16   And frankly, and you will know, by the way, we structured

17   our other discovery letter that had the nine categories of

18   documents corresponding to a whole group of RFPs.  That

19   we're at a loss at what to do here because they keep telling

20   us they're producing everything but they're not producing

21   the documents that we would expect to find here.

22             So when does the burden shift and no longer

23   become incumbent for us to ask for the documents as we've

24   asked for numerous times?  And then for them to say, well,

25   they never asked us for A, B, C, D, E, F, G, H, I, J, K, L,

1    M, N, O, P?  Because we have asked for those, and we put

2    those in the stipulation for this exact reason.

3              THE COURT:  All right.  I think I heard enough

4    on this issue, and I'm prepared to make a ruling.

5              Again, this ruling is subject to what I put on

6    the record about the objections under Rule 72(a).

7              With respect this request to compel defendants

8    to comply with the stipulation ordered by Judge Stark, and

9    the stipulation document item number is Document 103.

10             I will grant it in part.  And this is the

11   fashion in which I am granting it.  In my view, I am not

12   going to broadly interpret use of the phrase "information

13   and documents" that used in the relevant paragraph of this

14   stipulation.  I will narrowly interpret it in accordance

15   with what appears to the intent of the stipulation to narrow

16   the scope of the request for production.

17             I will grant the motion, and I will ask and

18   order that defendants supplement their response to the

19   Requests For Production at issue with respect to production

20   of any presentation, any documents relating to planning and

21   preparing for the auditing process that resulted in these

22   auditing reports being produced with respect to as they

23   relate to the accused products and also to supplement with

24   respect to any training materials explaining or describing

25   the auditing process to employees of the defendant as they

1    relate to the accused products.

2              If, in fact, the defendants have nothing to

3    supplement, then they shall so state in their response to

4    these Requests For Production.  Defendants have made a

5    reasonable search and their production is complete.

6              I will not compel the defendants to provide

7    any further type of detailed certification or response at

8    this time other than to represent that they have made a

9    reasonable search for the ancillary documents the Court has

10   ordered that they search for and produce, and that their

11   production is complete if they cannot locate any of these

12   documents.

13             Obviously, if documents can be located, they are

14   to be produced.  And to be consistent with the deadlines

15   we've been discussing in this case, I'll ask that that be

16   done on or before January 28th.

17             So that is my ruling with respect to this

18   motion.

19             Any -- I'm sorry?

20             MR. LEVINSTEIN:  Understood, Your Honor.  Thank

21   you.

22             THE COURT:  All right.  Let's move on and give

23   me a moment to transition to the most voluminous set of

24   briefing and exhibits that I received with respect to our

25   conference today.  Just give me a moment.

1        (Pause.)

2        THE COURT:  All right.  So the next series of

3    requests pursuant to a motion to compel in the plaintiffs'

4    again motion, vis-à-vis defendants' responses to certain

5    discovery obligations.

6        There are approximately nine bullet points and

7    an additional dispute with respect to noninfringing

8    alternatives.

9        With respect to the nine bullet points, it's my

10   preference to go bullet point by bullet point, resolve each

11   one consecutively rather than speaking about all nine as a

12   whole.

13       In light of that, if any of these nine have

14   since been resolved, that would greatly help the Court.

15   Otherwise, my instructions stand as I gave them at the

16   beginning of this conference.  Please be succinct and direct

17   about describing to the Court specifically what is deficient

18   and what relief plaintiffs are seeking the Court to order.

19       But let start with the first one which is

20   organizational charts and document retention policies.

21       Who is going start on behalf of the plaintiffs?

22       MR. LEVINSTEIN:  Thank you, Your Honor.  This is

23   Matthew Levinstein for plaintiffs.

24       And I agree that it will be helpful to attack

25   this on a bullet-point-by-bullet-point basis, but I will

1    start by saying that a lot of the same arguments will apply

2    to each of these bullet points, and so I won't repeat them.

3            And the other kind of general point that I

4    want to make sure the Court is aware of here is that this

5    isn't an ordinary motion to compel in that we're asking

6    for documents the defendants have said that they are not

7    producing them because of undue burden or relevance, et

8    cetera, et cetera.

9            They're saying they have searched and they have

10   given us everything they had, and we don't believe that to

11   be the case.

12           So I'm not sure how the Court wants us to

13   address the legal side of these arguments about, you know,

14   what we need to show in order to have the Court compel

15   defendants to go back and redo their document search, give

16   us their search protocol and certify that their productions

17   are complete.

18           So a little guidance that would be helpful

19   because I want to make sure I am telling the Court what it

20   wants to know here.

21           THE COURT:  Well, what I want to know is why you

22   suspect, why the plaintiffs suspect these responses are

23   deficient?  Some may be more readily determinable than

24   others.  So let's start at the beginning with organizational

25   charts and document retention policies.

1              The exhibits attached by Chervon reflect that

2     the defendants did in fact produce organizational charts.

3     So I am at a loss as to what I should read into that, that

4     allows the Court to conclude, as plaintiffs avers, that this

5     is sufficient in some sense.

6              MR. LEVINSTEIN:  Yes, Your Honor.  And the

7     reason for that are -- actually, there are multiple reasons.

8     The first is the nature of the case.  And I won't get into

9     details, but you know that these are large parties.

10    Defendants are a group of international companies.  You

11    know, I should say companies that are doing business on an

12    international level.  They have identified numerous

13    individuals, at least 10, that have relevant information.

14             And frankly we would expect there to be more,

15    more organizational charts than the four or so that they

16    have provided.  But at a minimum -- and again this dovetails

17    with the other categories that we have identified -- if

18    this is it, then we want that in writing, that they're

19    certifying their production because, you know, we're all

20    patent savvy attorneys or I would say judges here.  That we

21    know what we're expecting when we receive a document

22    production, and we just haven't received it with respect to

23    organizational charts and document retention policies.  And

24    again defendants have told us that they don't have document

25    retention policies.

```
 1              Okay.  Again, that strikes us as somewhat
 2    surprising, but if that is the case, then we would expect
 3    them to be willing to certify that.
 4              THE COURT:  All right.  Let me hear from who is
 5    going to address it on behalf of the defendants.
 6              MR. BIGGS:  Thank you, Your Honor.  Good
 7    afternoon.  This is Brian Biggs from DLA Piper on behalf of
 8    the defendants.
 9              Your Honor, as the plaintiffs have just alluded,
10    there are going to be some themes that are going to permeate
11    all these bullet points.  So if I may take a minute at the
12    outset to lay some of the context?
13              Plaintiffs just mentioned that these are large
14    international companies, sophisticated companies.  And that
15    is true.  But one thing to keep in mind is that the accused
16    products here are a very small piece of defendants'
17    business.
18              So TTI has many, many brands in its portfolio:
19    Milwaukee Tools, Hoover, Dirt Devil.  And so One World and
20    Ryobi are just one piece of it.  And then if you drill down
21    further -- and pardon my use of the pun of drills with Ryobi
22    products.  But if you drill down further and look at One
23    World, there are several business units within One World
24    that are unrelated to the mowers.
25              And, Your Honor, if I may direct you to
```

1    defendants' submission on this point, Exhibit No. 1.

2              You see that even within Ryobi, one of the

3    organizational charts, Your Honor, just mentioned, you will

4    see even within Ryobi, of those several business units, you

5    can drill down even further within those business units.

6    Here, we see a org chart for the 2020 cordless product

7    development team.  So this is not even the entire scope of

8    One World's Ryobi business unit.

9              Mowers is just that left-hand column.  You see

10   under Ryan Kropfelder, Senior PM for Mowers, there are

11   several types of mowers.  All right?  So we're not even

12   talking about the right two columns.  And within mowers,

13   we're not even talking about all three of those product

14   managers.  Right?  Riding mowers are not at issue here.

15   Snow/tour not at issue here.  What we're talking about are

16   just push mowers.

17             And you can even drill down further than that,

18   right?  The accused products are not all push mowers.  In

19   fact, the lion's share of the market, today at least, are

20   gas powered mowers.  Gas powered mowers are not at issue.

21   Corded mowers are not at issue.  We're just talking about

22   battery powered walk-behind mowers.

23             So to plaintiffs' point that these are

24   sophisticated parties, this, what we're talking about here

25   is a very small piece of the defendants' overall business.

1              And I would like to provide Your Honor, if you

2    would permit me, some context on the investigation that

3    defendants have made to date.  And I don't want to get into

4    a work product or attorney client privilege communication,

5    but I think I can given you at least the high level points

6    to show that the investigation has actually been fulsome and

7    impressive in my mind.

8              Counsel, DLA Piper has worked with in-house

9    counsel at TTI One World that is sophisticated,

10   knowledgeable in litigation.

11             We've identified potential custodians and

12   noncustodial data sources.  And, in fact, we have worked

13   with in-house counsel over 20 custodians.  All right?  And

14   that includes custodians in product development; right?

15   More than 10 custodians in that group, starting with the

16   Senior Vice President all the way down.

17             We've worked with the engineering team, at least

18   five custodians starting with the Senior Vice President all

19   the way down.

20             On the financial team, we went all the way to

21   the Chief Financial Officer, and worked with her and with

22   the Chief Financial Officer and her report.

23             And then in the marketing, again, we started

24   with the Senior Vice President and worked from there.

25             So the investigation has been fulsome, right?

1       We interviewed witnesses, the custodians, and then performed

2       the collection based on those interviews.

3               But that is not where we stop either, right?

4       Throughout the meet-and-confer process, which has been

5       lengthy, we have worked with Chervon.  That after we have

6       made our productions based on our understanding of the scope

7       of the production, we have entertained what Chervon thinks

8       is missing, and then we dutifully go back to our client.

9               We have done this over and over again through

10      out this, throughout the discovery process.  And where we

11      eventually got to I guess our impasse, and which I'm still

12      not entirely sure what plaintiff is asking for at this

13      point, on our recent meet and confers, we explained to them,

14      look, we have looked for those documents.  They do not --

15      based on our reasonable investigation, we have not found

16      responsive nonprivileged documents to produce.  We're not

17      withholding anything.

18              And frankly, Your Honor, on the most recent meet

19      and confer on this issue, I was told that they just don't

20      believe us.  And I'm not really sure where to go from there.

21              If the resolution is at the end of the day today

22      that we certify that in writing as you just ordered us to do

23      on the prior dispute, so be it.  I think that is something I

24      think we're happy to do, but I'm not sure what other sort of

25      order that the Court could make that we could even carry out

1    from there.

2              And one last point that I would note is that

3    one thing we've been, we've been sort of surprised about

4    throughout this process and it is coming to a head with

5    some of the other discovery disputes is the fact that

6    plaintiffs are ignoring the email discovery limits that we

7    had negotiated earlier on in the discovery period.

8              THE COURT:  All right.  We'll get to those in a

9    moment.  And I think we have limited time.  I do have other

10   matters in other unrelated cases on my calendar this

11   afternoon, so I'd like to get through these bullet points

12   and find a path going forward.

13             I do appreciate, though, Mr. Biggs, thank you

14   for the background information.  And we'll try to address

15   everything as we go along.

16             I do have one question with respect to the

17   organizational charts.

18             To the extent you have narrowed the universe

19   of accused products to these battery powered walk-behind

20   mowers, does the organizational chart produced to the

21   plaintiffs adequately respond to their discovery requests

22   for an organizational chart that relates to that decision

23   or portion of defendants' business that is responsible for

24   manufacture and sales of these battery powered walk-behind

25   mowers?

1              MR. BIGGS:  They do, Your Honor.

2              THE COURT:  Is there anything further to produce

3    as far as you know with respect to organizational charts on

4    that?

5              MR. BIGGS:  No, Your Honor.  This is not

6    actually something that the client keeps in the ordinary

7    course of business.  The same thing with the document

8    retention policy.  And so there is nothing further to

9    produce.

10             THE COURT:  All right.  Let me ask, with respect

11   to the document retention policies, the words that struck

12   out, stood out for me when I reviewed defendants' response

13   at Document Item No. 151 was that defendants did not have a

14   written document retention policy to produce.

15             And I'm not sure if that meant that there was

16   some other form of document retention policy that there was

17   perhaps an individual who stored these document retention

18   policies in his or her head, and that is how they're

19   maintained.

20             There is some -- I need some clarification to

21   that response, qualifying document retention policies by

22   what you have written.

23             MR. BIGGS:  Your Honor, that's a fair question.

24   And we were not trying to be coy with the use the word

25   "written" there.  It is simply an acknowledgment of the fact

1    these are Requests For Production.  We don't have documents

2    to produce that reflect the document retention policy.  I

3    think the caveat, if anything, is just to suggest that there

4    are retention policies that, you know, just as a business

5    that functions, they're retaining stuff in some way but not

6    in any sort of written, formal form.

7             THE COURT:  All right.  Anything further,

8    Mr. Levinstein?

9             You may be on mute.  I'm not hearing you.

10            MR. LEVINSTEIN:  I'm so sorry, Your Honor.  I

11   was on mute.  I will be very brief.

12            In response to Mr. Biggs' context that he

13   provided about what defendants have done to search for

14   documents, I think the "elephant in the room" is if they

15   have conducted what Mr. Biggs describes as a robust search,

16   why aren't they willing to explain that in detail in

17   something they submit to the Court?

18            And it sounds like they're at least willing to

19   certify the production, but the biggest "elephant in the

20   room" is where are the documents?  Where are the documents?

21            They produced 1,700 pages in this case.  I'm

22   sorry, 1,700 documents I believe in this a case, give or

23   take.  And I think a thousand of those are CPSC reports.

24            And so I know that doesn't help Your Honor in

25   terms of the specific document retention policies, but that

1    is the difficulty of having us prove a negative here.

2              And so what we've tried to do with our briefing

3    is identify from the specific categories but also the

4    context in which these document requests were served, you

5    know, for the case and the nature of defendants, et cetera,

6    why we don't believe that document search has been fulsome

7    in this case.

8              THE COURT:  Well, a couple of points here.

9              With respect to organizational charts and

10   document retention policies, when I hear an argument

11   from the defendants that -- a response, that is, from the

12   defendants that they have searched and have produced

13   everything that they can come up with in their searching

14   that is responsive, I rarely, unless I have reason to

15   believe otherwise, rarely do I, can I fashion or can any

16   court fashion an order compelling a party to produce that

17   which it does not have.

18             All I can do in this instance is require the

19   party saying that they have satisfied their production

20   obligation to formally respond in a supplementary fashion to

21   the outstanding Request For Production that they have made a

22   reasonable search and have produced all responsive documents

23   completely.  That is what I can do.

24             Unless the plaintiffs or the movant, whichever

25   party it is, in this instance the plaintiffs, but unless you

can come up with something that is indicative from the
response that you have got already that, for instance,
refers to another document that was not produced or refers
to perhaps an individual who has not been disclosed
throughout the remainder of the discovery as it has been
progressing and someone hasn't been able to have those
documents as a records custodian or otherwise or email
custodian, whatever, unless you can come up with something
that supports a belief, suspicion, speculation, whatever you
want to call it, that there should be more but we haven't
got it, there is little the Court can do because rulings
cannot be made on speculation and conjecture in the face of
an Officer of the Court representing that a reasonable
search has been made and all responsive documents have been
supplied and disclosed.

          So with respect to -- go ahead.  I'm sorry.
Does that provoke a comment or a question or an inquiry?

          MR. LEVINSTEIN:  No.  I think that everything
you said, Your Honor, is absolutely fair with the exception
of what we would also like, at least with the organizational
charts and document retention policies, and again I don't
know that this is something that defendants could provide on
a bullet-point-by-bullet-point basis, because I know that is
not necessarily how a document collection goes, but we would
like to understand what they have done in detail to produce

1  that in its submission in addition to certifying the

2  production is complete.

3          Now, for other bullet points, as you'll see as

4  you get further down that have some more meat on the bones

5  there, we do believe that we have evidence that rises above

6  the level of speculation that additional documents exist.

7          But at least for the organizational charts and

8  document retention policies, we think it's a fair ask given

9  the type of case this is, given the scope of production

10 thus far that plaintiffs -- that defendants, excuse me, not

11 only certify the production but tell us what they've done to

12 get to that point.

13         THE COURT:  Again, the Court needs something

14 more than a suspicion to order that level of detail.  And

15 perhaps when the parties are taking depositions of fact

16 witnesses, should there be questions posed as to if a

17 witness is shown a document, you know, where its source is,

18 how it is kept in the ordinary course of business, whatever,

19 that raises a question about the representation that a

20 complete search and a complete response was made, then maybe

21 at that point -- I mean there are instances in other cases

22 where perhaps a record custodian deposition could be ordered

23 by the Court to explain the level of the search that was

24 done for a particular universe of documents.

25         But for the Court to order nine of them, this is

1    at this time, based on this record, I'm not inclined to go

2    down that path, at least not on this record.

3            So let's take each of these individually.  And for

4    the organizational charts, the document retention policies,

5    I'm going to deny the motion to compel, but as I did with

6    the previous request, I will compel, order the defendants to

7    indicate formally rather than just on this record and in

8    the meet and confers respond formally to the Request For

9    Production relating to these which are identified in

10   plaintiffs' submission in a formal way that a reasonable

11   search has been conducted and the defendants have no further

12   documents to provide.  Their production is complete.  So I

13   will ask that that be done with to organizational charts and

14   document retention policies.

15           Let's move on.  And, Mr. Levinstein, if you are

16   going to address the next bullet point, which is documents

17   relating to the plaintiffs and the inventors, litigation,

18   et cetera, my first question to you, perhaps that you can

19   address it at the outset, is:  What are the parties doing

20   about a privilege log?

21           It seems to me that this request for these

22   specified Request For Production numbers tread into areas

23   that might be met with a claim of privilege.  And I don't

24   know if the parties have discussed or made an agreement

25   about what to do about privilege logs, if any.

1            MR. LEVINSTEIN:  Thank you, Your Honor.  This is

2     Matthew Levinstein again.

3            I have to say that I don't know off the top of

4     my head if the parties have an agreement yet on privilege

5     logs or what they're planning to do.

6            I'm not sure if may colleague James Lukas has

7     anything to add on that, but I'm not aware of it right now.

8            MR. LUKAS:  I'm not either.

9            THE COURT:  All right.

10           MR. LUKAS:  This is James Lukas.

11           THE COURT:  Thank you both, counsel.

12           All right.  Mr. Levinstein, what are plaintiffs

13    looking for here, and what we do believe?  Because no

14    nonprivileged documents have been produced.  As defendants

15    say, that there must be something there that is

16    nonprivileged that defendants ought to be producing.

17           MR. LEVINSTEIN:  Sure.  Well, at a minimum, we

18    would certainly want anything that defendants contend are

19    privileged to appear on a privilege log.  And certainly

20    following this call, I've already made a note that we need

21    to figure that out with the other party.  And I assure the

22    Court that we will do that and work together to figure

23    something out in terms of privileged documents.

24           So setting aside for the moment, again, given

25    the fact that these companies are literally the No. 1 and

1    No. 2 lawnmower competitors at, or were at Home Depot, it

2    strikes me as incredibly odd that defendants have produced,

3    they claim it is eight documents relating to Chervon.   I

4    can't understand how there could only be eight documents

5    relating to Chervon, even if you limit it to just the

6    accused products or lawnmowers.

7            So just from that starting point, given that

8    they haven't produced very much if at all on this topic, I

9    don't have other documentary evidence to point the Court

10   to, but certainly you would expect them to have documents

11   relating to Chervon particularly with respect to the subject

12   matter at issue here, the products at issue.

13            THE COURT:  All right.  Let me hear from

14   defendants.

15            MR. BIGGS:  Thank you, Your Honor.  And I start

16   off, I apologize --

17            THE COURT:  Is this Mr. Biggs again?

18            MR. BIGGS:  My apologies, Your Honor.  Yes,

19   Brian Biggs again.

20            THE COURT:  Thank you.

21            MR. BIGGS:  Thank you.

22            I do not want to sound like a broken record, but

23   I think you are going to hear the same response from me for

24   at least the next couple of bullet points.

25            Again, we have conducted a search.  We have

1    produced everything we found that is responsive and

2    nonprivileged.

3              I think Your Honor has hit on a point here that

4    some of this stuff is likely to be privileged.  And, of

5    course, when the parties -- and I can confirm our

6    understanding as well is that the parties have not broached

7    the subject of privilege logs, but if we have communications

8    that should be logged, of course, they will show up there.

9              The one thing I think is also helpful, which was

10   the third point of sort of the overarching context I wanted

11   to raise, which is related now to Bullet Point No. 2 here

12   is the idea that the parties negotiated an email production

13   protocol.

14             What I'm hearing from Mr. Levinstein is that

15   they're expecting more communications.  And the parties

16   agreed on how email production would be limited, and it's

17   in that Exhibit 15 to our responsive submissions on these

18   issues where on March of 2020, plaintiffs' counsel proposed

19   that we limit email discovery to five custodians, five

20   search terms following the default temporal limitations and

21   use only narrowly tailored search terms.  And, thereafter,

22   plaintiffs served on defendants an email request identifying

23   the five custodians they wanted, the five search terms they

24   wanted.

25             And, Your Honor, in those search terms, there

1    were terms that covered Ego, which is the branded name of

2    the Chervon mower, and Chervon itself.

3            And I should say, to continue how that process

4    occurs, there is one term that defendants objected to.  It

5    was a term that was focused on blowers.  Blowers are not

6    accused in this case, so we objected on that basis.

7            So we ran the other four search terms over those

8    custodians.  And to give Your Honor a little bit of additional

9    context, we received another set of email requests from

10   Chervon with one additional term, presumably to get to that

11   fifth search term that we had agreed to initially.

12           And so, Your Honor, we've run those terms over

13   those custodians and we have produced what we had.

14           Our understanding -- and I think this is --

15   well, I know this is indicative of the way that I conduct

16   cover discovery and use these e-mail agreements -- is that

17   is the scope of the email discovery.  We don't then have a

18   further obligation to go dive through everybody at One

19   World's emails for responsive documents.

20           So if that is what plaintiffs are asking, I

21   think we're at just a fundamental impasse on that issue.

22           But I will say other than diving into email

23   boxes of a bunch of additional, a bunch of additional

24   custodians that they've never identified for us or anything

25   of that nature, what we have done is the fulsome

1    investigation I discussed before.  We talked to each of the

2    custodians.  We looked for everything in response to their

3    RFPs, and we've produced what we found.

4              MR. LEVINSTEIN:  Your Honor, this is Matthew

5    Levinstein.  May I respond?

6              THE COURT:  Yes, go ahead.

7              MR. LEVINSTEIN:  Thank you, Your Honor.

8         I think as we're learning over the last few

9    days but also right now on this call, I think there is

10   fundamental disagreement over the scope of email production

11   in this case.

12              Yes, Your Honor has I believe before heard the

13   agreements relating to email requests as the parties agreed

14   to.  That was in no way shape or form designed to limit or

15   somehow forego the other parties' obligation to search

16   through emails for responsive documents or even if it's in

17   response to an interrogatory.

18              What we envisioned that to be was a separate

19   way to propound email requests to avoid the situation where

20   someone says I want 50 custodians to be searched for 10,000

21   terms, you know, just the word "circle," things like that,

22   but we certainly did not intend to that to limit the scope

23   of what would otherwise presumably be included in a

24   reasonable search for documents in response to document

25   production requests.

1          So I'm not sure how the Court wants us to handle

2     that now or if we should be handling that off-line, but that

3     is going to come up over and over and over again, I presume

4     based on what Mr. Biggs just told us for every single bullet

5     point here on out.

6          THE COURT:   I see that as a problem, too,

7     because responsive documents to specific requests for

8     production are not limited to responsive emails.   There is

9     a larger universe there whereas email discovery is email

10    discovery, and that is where the parties get together and

11    determine how many custodians will be searched and how many

12    search terms.   You know, in this case, the parties agreed

13    to something less than is typical in the Court's default

14    standard, and that's fine.   The parties can again stipulate

15    and agree to whatever mutually works in any particular case

16    because as we know each case is different.

17         But Requests For Production aren't necessarily

18    -- aren't then a subset of email discovery.   Request For

19    Production are independent requests for production.   I think

20    that is where the disconnect may be here.   And as I said,

21    there is also the issue of the parties walking around

22    perhaps the issue of privilege and holding back documents

23    that may be privileged in the absence of any privilege log

24    being produced.

25         And I'm open to suggestions, but I'm inclined

1    not to address all of these nine bullet points today until

2    the parties have a further meet and confer about what

3    plaintiffs are specifically seeking and how there may be

4    other documents out there beyond the email of the custodians

5    who have been searched and what defendants can do to assure

6    that a search beyond emails has resulted in production of

7    all responsive nonprivileged documents.

8            And along the same lines, I would like the

9    parties to take the opportunity to begin that discussion of

10   when and how to put together a privilege log for both sides

11   to put together privilege log so that we can address any

12   claims of arguments relating to what is on the privilege log

13   in due course.

14           I'm not sure how I can go bullet point by bullet

15   point if it is the defendants' position that they've

16   searched within the confines of the parameters of the email

17   custodians and email search terms but not otherwise with

18   respect to those topics.  So if I'm misunderstanding what

19   the defendants have done, I'll give them an opportunity to

20   clarify, but I'm not inclined to go further with this type

21   of gap until the parties have met and conferred further.

22           MR. BIGGS:  Your Honor, this is Brian Biggs for

23   defendants again.  If I may?

24           THE COURT:  Okay.

25           MR. BIGGS:  So I actually do think, and I

 1   apologize if I was unclear in my prior recitation of the way

 2   we conducted the discovery, because the way we conducted the

 3   investigation based on the RFPs was independent of the email

 4   protocol.

 5             So when we went and asked the custodians for

 6   documents, it was not, hey, only tell me about non-email

 7   documents.  It was what documents do you have that relate to

 8   this.

 9             What I was suggesting was that, what the parties

10   had agreed to so that we don't have to go through exhaustive

11   email discovery was to agree to certain parameters.  So when

12   we conducted the search under the RFPs it was not limited to

13   only non-emails, it was more so that the comment was to

14   reflect that to the extent they're seeking emails specifically

15   beyond what, you know, the general RFPs are requesting, that

16   is covered by the RFP or the email agreement.  So I didn't

17   want to mislead the Court, suggest that we intentionally

18   excluded emails from our initial searching.

19             And one other point that I would note, Your

20   Honor, is that -- and I allow plaintiffs to please correct

21   me if I'm wrong about this, but -- sorry.  Please correct me

22   if I'm wrong about this, but I don't believe Chervon has

23   produced a single email yet.

24             Now, we have not propounded email requests on

25   them yet, and so that might be why.  But if what they're

1    suggesting is that we should have conducted a large fulsome

2    investigation into all the emails of all the folks at One

3    World beyond the custodians we interviewed, that is not what

4    Chervon has done with their production either.

5            So I thought that those two points of context

6    might be helpful for Your Honor.

7            MR. LEVINSTEIN:  Your Honor, this is Matt

8    Levinstein.  May I respond to that?

9            THE COURT:  Go ahead.

10            MR. LEVINSTEIN:  I am now very confused.  As to

11   the scope of One World production, and I want to be very

12   clear with the Court about what it is that we sought.  We

13   explained our interpretation of the stipulated email

14   requests that we had agreed to with the other party.

15            But our document requests also covers ESI, as

16   they should.  It explicitly includes emails.  And I don't

17   believe that defendants objected to any of our RFPs on the

18   basis that we were seeking emails and we have a separate

19   full, the total email production stipulation that governs

20   every single email produced in the case.

21            So I think I agree with Your Honor that what

22   we need to do is we need to sit down.  The parties need to

23   sit down and figure out what is the overall scope of email

24   production, because, again, understanding now that they

25   haven't even searched for email responses or maybe they

1  searched for email responsive to RFPs, maybe they haven't,

2  I'm still not 100 percent sure, how is it possible that

3  there is not a single email?  Maybe they produced one.  How

4  is there only one email between defendants and the Home

5  Depot, their exclusive retailer for accused products at

6  issue here?

7          So I guess my mind is spinning a little bit, and

8  I do think the parties need to get together on this.

9          THE COURT:  All right.  I think that is a

10  necessity because I don't know how I can resolve these,

11  and despite my ruling on the record about not being

12  comfortable ordering production based on the absence of a

13  larger production, there are certain bullet points here that

14  do cause the Court to question just what the scope of the

15  search was, how thorough it was, if there was some reliance

16  upon an agreement for the email protocol and number of

17  custodians that made the search narrower than it perhaps

18  should have been.

19          I'm not saying that anything intentional or

20  nefarious was committed, but I'm just saying that the

21  parties may just be operating on different pages, on

22  different levels with respect to what the mutual

23  understanding is of the production obligations here.

24          So I think it would be helpful that I defer

25  ruling on these bullet points without prejudice for the

1    parties to meet and confer about a number of things about

2    these nine bullet points, about the scope of the mutual

3    agreement with respect to email searching and production and

4    also with respect to privilege logs as we have discussed

5    previously.  And then depending on the outcome of that, the

6    Court will permit plaintiffs to raise issues that I deferred

7    on this case.

8              Now, I'm not going to promise to do that on the

9    28th because I want to give the parties some instructions

10   about what we will be accomplishing at the next discovery

11   dispute hearing on January 28th in a moment, but I do think

12   that the parties need to meet and confer on these points and

13   do that very promptly as soon as both sides are available to

14   do that and well before I hear the next round of issues on

15   the 28th.

16             So let me just ask, I'll ask Mr. Levinstein

17   first and then Mr. Biggs may weigh in.

18             With respect to the last item that was briefed

19   with respect to the discovery dispute on plaintiffs' motion

20   to compel, the identification of "meet each noninfringing

21   alternative," is that something that is captured by what

22   we've just been discussing on these nine bullet points or is

23   that independent of it?  And can we address that last issue

24   raised by plaintiffs on this call?

25             Let me hear first from Mr. Levinstein.

```
 1                  MR. LEVINSTEIN:  Your Honor, thank you.  I
 2      believe it is an independent issue that can be addressed on
 3      this call.
 4                  THE COURT:  All right.  Then I give you the
 5      floor to address it.
 6                  MR. LEVINSTEIN:  Thank you, Your Honor.  So
 7      Interrogatory No. 5, as you said, is requesting specific
 8      information regarding the identification of acceptable
 9      noninfringing alternatives.
10                  This is a very common request in patent
11      infringement cases.  It relates in the lost profits context.
12      And just to give a very brief background on that.
13                  One of the tests to determine whether a patentee
14      is able to obtain lost profits requires a patentee to show
15      that there are no acceptable noninfringing alternatives,
16      meaning that if the consumers couldn't purchase the accused
17      products, they wouldn't have necessarily purchased the
18      patentee's product, they would have purchased some other
19      third-party product.
20                  THE COURT:  Yes, I appreciate your explanation
21      and the background, but I think the disconnect here, at
22      least as I read the defendants' response is, again, the
23      scope of it.  Is it the entire lawnmower is the accused
24      product because the other side isn't seeing it that way?
25      They're looking specifically at the handle mechanism.  And I
```

1   think that disagreement, so to speak, between the parties is

2   what is generating perhaps the disputes that I have in front

3   of me.  And I need to find out how to cut through that and

4   just what the scope of discovery is that plaintiffs are

5   seeking here.

6                    MR. LEVINSTEIN:  Sure.  And, Your Honor,

7   respectfully, I think defendants' response is a red herring.

8   The claims, as you know, the claims state what the claims

9   state.  Most of the claims are directed to lawnmowers, but

10  regardless of that, this is about what products are being

11  sold.

12                  And we're not talking about selling individual

13  replacement handles here.  We're talking about the sales

14  of lawnmowers.  You know, what lawnmower?  Could someone

15  who purchased an accused product purchase instead of the

16  patentees, instead of Chervon's product, and so that is why

17  the specific identification of lawnmowers.

18                  And for defendants to come back and say every

19  single lawnmower that is compliant with the ANSI standards

20  and the CFR regulation is a noninfringing alternative,

21  they're missing the point of the interrogatory.

22                  The interrogatory asks for identification of

23  acceptable noninfringing alternatives.

24                  And they claim in their response to Interrogatory

25  No. 5, they being defendants, that all of their mowers are

1    acceptable noninfringing alternatives.  Of course as the Court

2    understands, those are accused of infringement here, and this

3    is a disagreement over infringement.

4              But then they say every third-party lawnmower

5    that is compliant with the standards is a noninfringing

6    alternative.  They do not state that it is an acceptable

7    noninfringing alternative.  We don't know what defendants

8    believe to be acceptable noninfringing alternatives.

9              If they are going to come out and say every

10   single lawnmower that is compliant is an acceptable

11   noninfringing alternative, that is a non-answer because

12   that includes gas mowers.  That includes if the mower -- for

13   example, this is off the top of my head, if the mower blade

14   deck is 20 inches wide.  This could also include mower

15   blades that are, decks that are 12 inches wide or 40 inches

16   wide.  And it's just, it's not an acceptable answer.

17             We need a list, plain and simple, of which

18   lawnmowers they contend would be acceptable to consumers

19   as noninfringing alternatives if those consumers couldn't

20   purchase the accused products.

21             THE COURT:  All right.  I'll hear from

22   defendants' response.

23             MR. BIGGS:  Thank you, Your Honor.  Brian Biggs

24   from DLA Piper again.

25             And I will respond to a couple of points, but I

1    think we have a proposed resolution which is I, through the

2    briefing, I think I finally understood, finally, what

3    they're asking for.  And I think we can actually provide

4    what Mr. Lukas just asked for.

5              But to provide a little bit of context.

6              THE COURT:  Mr. Levinstein -- I'm glad.  I'm on

7    the same page with you, and I appreciate your proposal to

8    find a solution.

9              MR. BIGGS:  Yes.  So, Your Honor, a couple

10   things I would state.

11             The acceptability issue, which as I understand

12   what Mr. Levinstein was objecting to, is addressed by the

13   response.  The response says:  Any product on the market

14   that meets the standard, the ANSI standards and the

15   standards we discussed earlier today.

16             And so if it is acceptable and it meets the

17   standard, is on the market and people buy it, I think that

18   is a reasonable factual basis to rely on them as

19   noninfringing alternatives.

20             But if the question is really he wants a list of

21   which noninfringing alternative that we intend to rely upon,

22   you know, in expert discovery and at trial, we're happy to

23   provide that list.  That that is not a problem.  That is

24   something if that resolves the dispute, we're happy to do.

25             THE COURT:  Go ahead.

```
 1              MR. BIGGS:  I'm sorry.  I was just going to say

 2    obviously we need to discuss the reasonable scope, but maybe

 3    that is something we can further meet and confer with

 4    plaintiffs about.  But if ultimately what they're asking for

 5    is a list of the ones we're intending to rely upon, that is

 6    easily done.

 7              THE COURT:  All right.  Mr. Levinstein, anything

 8    further?

 9              MR. LEVINSTEIN:  Thank you, Your Honor.  Yes.

10    That is that is acceptable so long as they identify

11    everything they intend to rely on for the entire

12    noninfringement period.

13              THE COURT:  All right.  Then I will order the

14    defendants to supplement their response to, I think it's

15    Interrogatory No. 5 which is at issue with respect to the

16    noninfringing alternative and do it in the fashion described

17    on the record.  And -- I'm sorry.  Go ahead.  Is someone

18    speaking or maybe that was just an echo -- and do it in the

19    fashion that has been discussed on this record.

20              And can that be done, Mr. Biggs, on or before

21    January 28th, to be consistent with the deadline for other

22    obligations the Court has ordered in this matter?

23              MR. BIGGS:  Yes, Your Honor.

24              THE COURT:  All right.

25              All right.  So let me turn to January 28th.  I
```

1    looked at the two joint requests for teleconference to

2    resolve discovery disputes that were docketed at 126 and

3    147.  And as you know, I set those for discovery

4    teleconference starting at 2:00 p.m. on January 28th.

5    Looking at them, I see 12 issues, bullet point issues

6    collectively when I read both of those motions.

7                I would like the parties to meet and confer to

8    narrow that and to narrow that to half.  I don't want to

9    deal with 12 issues.  There is just simply not enough time

10   even if I spent the entire afternoon from 2:00 p.m. dealing

11   with it.  And I certainly don't want to be presented with

12   hundreds or perhaps a thousand pages of exhibits to go along

13   with all of those 12 issues.

14                So I'm asking that the parties, and I guess

15   these are all plaintiffs' issues, that you narrow it down to

16   six and that you brief it within the four-page limitation on

17   letter briefing that the Court has within the deadlines set

18   in my oral orders.  I think the opening submission is due on

19   January 25th, and the responsive submission is due on the

20   26th, so each four page submission.

21                If, for some reason, the parties cannot narrow

22   that down to six, and if, for some reason, the letter

23   briefing requirements are inadequate -- I also want to put

24   the brakes on the number of exhibits presented with.  I will

25   give each side no more than 100 pages of exhibits to go

1    along with your respective letter briefing.

2            If, for some reason, these limitations present

3    obstacles or a problem or you can't narrow it down to six, I

4    want a joint letter sent to me on or before January 20th

5    before the briefing even begins explaining what the

6    difficulty is and what the parties jointly propose to do

7    about it in terms of if you are seeking expansion of page

8    limitations, expansion of the 100 page limit on exhibits.

9    Fill that out for me in the joint submission of no more than

10   four pages in a letter due on or before January 20th.

11           And if the requests are reasonable, I'll

12   consider it.  But as you can probably understand, we've

13   spent a couple hours here today and we didn't even get

14   through those nine bullet points.  I'm just concerned about

15   having enough time to address all of the issues presented.

16           And based on what I have heard on this call, I

17   think if the parties sit down and really try to talk to one

18   another and perhaps not, you know, in a more meaningful way,

19   I think you will probably reach some agreement, if not

20   agreement at least an understanding of what the point of

21   these motions to compel are, what the goal it is in terms of

22   the discovery sought, and maybe that will at least clarify

23   some issues and reduce the number that the Court has to

24   address.

25           So that is my order for the next time we get

1    together.

2                    With that, is there anything further from the

3    plaintiffs that I should address on this call?

4                    MR. LUKAS:  Your Honor, James Lukas for the

5    plaintiffs.

6                    Nothing else for the plaintiffs.  Thank you.

7                    THE COURT:  All right.  Anything further on

8    behalf of the defendants?

9                    MR. BIGGS:  Your Honor, Brian Biggs from DLA

10   Piper on behalf of the defendants.

11                   No.  Thank you so much for your time.  We really

12   appreciate it.

13                   THE COURT:  All right.  Thank you, everyone, for

14   your time and for trying to comply with my request for being

15   direct and succinct.  You did a fine job, and I appreciate

16   it.  Everyone stay safe, and we'll meet again on January

17   28th.  Thank you.

18                   (The attorneys respond, "Thank You, Your Honor.")

19                   (Telephone conference ends at 3:00 p.m.)

20

21        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.
22

23                              /s/ Brian P. Gaffigan
                             Official Court Reporter
24                             U.S. District Court

25