# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHERVON (HK) LIMITED,<br>CHERVON NORTH AMERICA INC.,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>ONE WORLD TECHNOLOGIES, INC.,<br>TECHTRONIC INDUSTRIES CO.<br>LTD., and HOMELITE CONSUMER<br>PRODUCTS, INC.<br><br>    *Defendants*. | C.A. No. 19-1293-LPS<br><br>**HIGHLY CONFIDENTIAL<br>OUTSIDE COUNSEL EYES ONLY** |

## DECLARATION OF SEAN CUNNINGHAM IN RESPONSE
## TO THE COURT'S ORDER OF MAY 27, 2021

  I, Sean Cunningham, am lead counsel for Defendants One World Technologies, Inc, Techtronic Industries Co., Ltd., and Homelite Consumer Products, Inc. (collectively "Defendants") in this action. In response to the Court's oral order of May 27, 2021, I declare as follows:

  1. I am a partner with the law firm DLA Piper LLP (US) and US Chair of DLA Piper's Patent Litigation group. If called as a witness, I could and would testify competently to the information set forth in this declaration.

  2. I understand that Defendants employ an internal team of professionals who are trained on eDiscovery procedures, and that this internal team handles litigation requests such as requests for email document discovery. Since 2018, Defendants have used Microsoft 365, a cloud-based suite of Microsoft Office applications, which include email. I further understand that Microsoft offers a suite of eDiscovery tools that allows users to search for content in Exchange Online mailboxes, among other things. These eDiscovery tools include Content Search, Core

1

eDiscovery, and the Advanced eDiscovery solution. I understand these tools permit users to perform search queries like the ones typically seen in litigation. I understand that Defendants' internal team uses Microsoft 365 eDiscovery tools to test and run email queries and export the relevant results in this and other litigations.

3. I understand that before migrating to the cloud-based Microsoft 365 in 2018, Defendants used Microsoft Exchange as its email solution. Unlike Microsoft 365, Microsoft Exchange runs on a local area network using physical storage accessible by Defendants' employees. I understand that with Microsoft 365, the physical storage is maintained in the cloud. I understand that Defendants migrated from Microsoft Exchange to Microsoft 365 in 2018 (more than one year before this lawsuit was filed) to gain the advantages of cloud-based computing, among other things.

4. On April 22, 2020, Plaintiffs served their First Set of Email Production Requests on Defendants, which included five search strings to be applied to five custodians chosen by Plaintiffs; namely, Steve Holland, Brian Hobbs, Drew Patrick, Seth Chapman, and James Ferrell. DLA Piper promptly relayed these email requests.

5. Upon receiving the email requests, I understand that Defendants' internal team tested and ran sample search queries for custodian Steve Holland using the Microsoft 365 Compliance Core eDiscovery tool. The query returned search results that Defendants' internal team exported as a ".pst" file, which is a file format Microsoft uses to package emails and attachments. The team at DLA Piper used these sample search results to determine if the syntax of Plaintiffs' queries was correct and to determine what objections might be necessary. From this sample search set, we were able to determine that Plaintiffs' search queries were overinclusive, because (among other things) one of Plaintiffs' proposed search terms resulted in hits on Mr.

Holland's email signature block, resulting in the collection of emails that were not relevant to any issue in the case.

6. On or about June 15, 2020, DLA Piper requested that Defendants' eDiscovery team run Plaintiffs' search strings (except for one objected-to string regarding an unaccused product, which Defendants told Plaintiffs they would not run) across all of the requested custodians. On June 19, 2020, Defendants' internal team exported those search results in .pst file format and uploaded the .pst files to DLA Piper. Because of the large size of the files, it took several days for Defendants' internal team to upload the files, but that process was completed as of June 26, 2020. By that date, DLA Piper had received .pst files (each between seven and nine GB of data) containing email search results for custodians Brian Hobbs, Drew Patrick, and Seth Chapman. Defendants informed DLA Piper that the searches did not return any results for custodian James Ferrell.

7. Upon downloading the .pst files, my team discovered that the files were corrupted and could not be opened. I understand that data corruption is a relatively common problem with .pst files, so Microsoft publishes a tool called "ScanPST" that tries to extract emails from corrupted .pst files. DLA Piper tried the ScanPST tool, but it did not find any emails in the .pst files. At around the same time, Defendants' internal search reports indicated that the mailboxes contained mostly unindexed data, leaving the majority of their contents inaccessible and unsearchable. I understand that Defendants' internal team concluded that the unindexed portions of the mailboxes were corrupted and no longer accessible.

8. On or about June 30, 2020, Defendants ran the requested searches again at DLA Piper's request and uploaded the resulting .pst files to DLA Piper. This time, we were able to open the .pst files, so DLA Piper proceeded with its review of the emails contained in them.

The .pst files for custodians Steve Holland, Brian Hobbs, Seth Chapman, and Drew Patrick contained a total of 134 files. After completing a manual review of the emails, DLA Piper produced the responsive, non-privileged emails and attachments on October 15, 2020. Based on Defendant's objections served on May 22, 2020, DLA Piper did not produce emails where the search strings returned an irrelevant email hit based solely on a custodian's email signature block. As of this time, Defendants did not know that the unindexed files, which they believed to be corrupted and inaccessible, could potentially be recovered and searched.

9. The parties attended a discovery hearing before the Court on January 7, 2021. During the hearing, the parties discussed with the Court the status of Defendants' search for and production of documents responsive to various of Plaintiffs' requests for production. At the end of the hearing, the Court ordered the parties to revisit email discovery: "So I think it would be helpful that I defer ruling on these bullet points without prejudice for the parties to meet and confer about a number of things about these nine bullet points, <u>about the scope of the mutual agreement with respect to email searching and production</u> and also with respect to privilege logs as we have discussed previously. And then depending on the outcome of that, the Court will permit plaintiffs to raise issues that I deferred on this case." (Emphasis added.)

10. As a result of the Court's instruction at the hearing, the parties had an exchange of emails from January 8, 2021 to January 27, 2021 about a new protocol for searching and producing emails by both sides. On January 27, 2021 the parties agreed to a new email search protocol, which is memorialized in an email from Plaintiffs' counsel attached to this declaration as Exhibit 1. That email search protocol requires both sides to "(1) provide an identification of the relevant custodians; (2) re-run the search terms while considering appropriate modifications

4

(the modifications intended to ensure or confirm the search terms are returning meaningful hits); and (3) provide hit counts for those custodians and the terms (with modifications)."

11.     In light of the Court's instructions at the January 7, 2021 discovery hearing and the resulting negotiations between the parties for a new email search protocol, DLA Piper requested that Defendants' internal eDiscovery team export from the Microsoft cloud the entire contents of each custodian's email mailbox from July 2013 to the present, so that DLA Piper could load the entire contents of those mailboxes onto DLA Piper's eDiscovery platform. DLA Piper made this request on January 27, 2021, the day the new email search protocol agreement with Plaintiffs was reached. This was done to reduce search times and make it more efficient to modify search strings as the parties continued to negotiate the metes and bounds of the searches both sides would be running pursuant to the January 27, 2021 search protocol.

12.     The same day (January 27, 2021), Defendants' internal team reported that the resulting mailbox files would comprise roughly 600 GB of data and began downloading the mailboxes from the Microsoft cloud. On February 3, 2021, Defendants' internal team informed DLA Piper that downloading the mailboxes was going slowly, with frequent crashes requiring restarts. On February 11, 2021, Defendants informed DLA Piper that they had opened a ticket with Microsoft to try to speed up the download, but Microsoft responded that it had limited the download speed because it was larger than the allowed size. Despite these difficulties, I understand that Defendants were able to download the entire set of mailboxes from the Microsoft cloud and save them to a hard drive on or about February 12, 2021.

13.     DLA Piper received that hard drive on February 15, 2021 and began uploading the mailboxes to its eDiscovery platform, Relativity. DLA Piper's eDiscovery specialists discovered that the Relativity platform was able to index and process the data in the mailboxes

that Microsoft 365 had previously reported was unindexed and therefore believed to be corrupted. Using Relativity, DLA Piper was able to search a greater set of email data than was previously searchable, using modified email search strings according to the protocol the parties agreed to on January 27, 2021.

14.   DLA Piper also modified Plaintiffs' proposed search strings in view of the original searches returning hits on employee signature blocks. DLA Piper resolved this problem by including a proximity requirement between the word "mower" and other words in the search string. DLA Piper tested several proximity thresholds to ensure this modifications would return meaningful results. DLA Piper also found that emails including the names "Patrick" and "Patricia" were hitting on Plaintiffs' proposed searches for the term "pat*." To avoid this problem, DLA Piper modified those searches by spelling out "patent." After running the modified searches, which were disclosed to Chervon in March 2021, a manual review of the resulting emails was conducted (including reviewing the resulting emails for privilege), and DLA Piper produced the results of the modified email searches between May 10, 2021 and May 17, 2021. That production totaled approximately 60,000 pages of responsive, non-privileged emails and attachments.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated June 4, 2021

_____
Sean C. Cunningham