# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHERVON (HK) LTD., CHERVON NORTH AMERICA, INC., | |
| Plaintiffs, | |
| v. | C.A. No. 19-1293-GBW |
| | **UNSEALED ON 4/30/2025** |
| ONE WORLD TECHNOLOGIES, INC., TECHTRONIC INDUSTRIES CO. LTD., HOMELITE CONSUMER PRODUCTS, INC., | |
| Defendants. | |

---

Benjamin J. Schladweiler, Renée Mosley Delcollo, GREENBERG TRAURIG, LLP, Wilmington, DE; Michael A. Nicodema, GREENBERG TRAURIG, LLP, Florham Park, NJ; James J. Lukas, Jr., Matthew J. Levinstein, Benjamin P. Gilford, Patrick J. Owens, GREENBERG TRAURIG, LLP, Chicago, IL; Erik M. Bokar, GREENBERG TRAURIG, P.A., Orlando, FL.

*Counsel for Plaintiffs*

Brian A. Biggs, Stephanie E. O'Byrne, Erin E. Larson, DLA PIPER LLP (US), Wilmington, DE; Sean C. Cunningham, Erin P. Gibson, David R. Knudson, DLA PIPER LLP (US), San Diego, CA; Tessa Duxbury, DLA PIPER LLP (US), Los Angeles, CA.

*Counsel for Defendants*

## MEMORANDUM OPINION

January 13, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiffs Chervon (HK) Ltd. and Chervon North America, Inc. (collectively, "Chervon" or "Plaintiff") filed their Second Amended Complaint (D.I. 45) against Defendants One World Technologies, Inc., Techtronic Industries Co. Ltd., and Homelite Consumer Products, Inc. (collectively, "One World" or "Defendant") alleging "infringement of nine patents relating to technology [purportedly] embodied by [Chervon's] EGO brand of lawn mowers." D.I. 45 ¶ 1. Pending before the Court are Chervon's: (1) Motion No. 1 – Summary Judgment of No Inequitable Conduct (D.I. 400) (the "No Inequitable Conduct Motion"), which has been fully briefed (*see* D.I. 410; D.I. 423; D.I. 442); (2) Motion No. 2 – Summary Judgment of Infringement (D.I. 401) (the "Infringement Motion"), which has been fully briefed (*see* D.I. 410; D.I. 423; D.I. 442); (3) Motion No. 3 – Summary Judgment That the Asserted Claims of the IPR Patents Are Not Invalid as Obvious (D.I. 402) (the "Section 103 Motion"), which has been fully briefed (*see* D.I. 410; D.I. 423; D.I. 442); (4) Motion No. 4 – Summary Judgment That the Asserted Claims Are Not Invalid Under 35 U.S.C. § 112 (D.I. 403) (the "Section 112 Motion"), which has been fully briefed (*see* D.I. 410; D.I. 423; D.I. 442); and (5) Daubert Motion to Exclude Certain Expert Opinions and Testimony (D.I. 404) (the "Daubert Motion"), which has been fully briefed (*see* D.I. 410; D.I. 423; D.I. 442).[1]

For the following reasons, the Court DENIES Chervon's Motions. Since the Court was able to resolve Chervon's Motions without oral argument, the Court also denies-as-moot Chervon's request for oral argument (D.I. 451).

---

[1] Collectively, these five motions will be referred to as "Chervon's Motions."

## I.    BACKGROUND

Chervon has "move[d] for the entry of summary judgment in [its] favor on [One World's] inequitable conduct affirmative defense." D.I. 400 at 1. Chervon contends that "[s]ummary judgment of no inequitable conduct is appropriate because there is no genuine issue that [One World] cannot meet [its] clear and convincing evidence burden of proving but-for materiality and specific intent to deceive." D.I. 410 at 4. One World opposes the No Inequitable Conduct Motion. One World contends that, at a minimum, there are genuine issues of material fact, with respect to both materiality and intent, that preclude the Court granting the No Inequitable Conduct Motion. *See* D.I. 423 at 1, 16, 18.

Chervon also "move[s] to exclude certain opinions of [One World's] rebuttal survey expert, Dr. Joel Steckel, and certain opinions of [One World's] technical expert, Mr. E. Smith Reed." D.I. 404 at 1. Chervon contends that these experts proffer testimony that is inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *See* D.I. 410 at 42-43. One World opposes the Daubert Motion. One World contends that "[t]he Court [] should deny Chervon's motions to exclude relevant, admissible expert testimony." D.I. 423 at 47.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* at 308 (quoting *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016)).

2

**B.    Fed. R. Evid. 702**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme

Court held that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in

order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to

the task at hand." Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have . . . [held] that a broad range of knowledge, skills, and training qualify an expert. Secondly, the testimony must be reliable; it must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Finally, Rule 702 requires that the expert testimony . . . must be relevant for the purposes of the case and must assist the trier of fact.

*Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (cleaned up); *Kuhar v. Petzl Co.*, No. 19-

3900, 2022 WL 1101580, at *7 (3d Cir. Apr. 13, 2022) (noting the same trilogy).[2]

Rule 702 "has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237,

243 (3d Cir. 2008) (citation omitted); *see also United States v. Scripps*, 599 F. App'x 443, 447 (3d

---

[2] "The Court of Appeals wrote under an earlier version of Rule 702. Subsequent amendments affect the substance of the rule, but [the Court] do[es] not think they alter the applicability of the quoted discussion." *In Re Novartis Pharms. Corp. v. MSN Pharms. Inc.*, No. 20-MD-2930-RGA, 2024 WL 4723274, at *2 (D. Del. Nov. 8, 2024).

Cir. 2015) (same). "[T]he question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017) (quoting *Daubert*, 509 U.S. at 596).

## III.    DISCUSSION

### A.    Summary Judgment Motion 1: The Court Denies the No Inequitable Conduct Motion

One World's inequitable conduct defense is as follows: "Chervon's prosecution counsel and one of the inventors of the asserted patents knew a foreign prior art reference called Outils includes one or more figures that are material to patentability of four of the asserted patents" and intentionally omitted such purportedly material figures "that would have caused the examiner to reject their claims." D.I. 423 at 3; *see* D.I. 424 ¶ 1. Moreover, One World contends that the inequitable conduct occurred during prosecution of four patents and that two additional patents are "unenforceable under the doctrine of infectious unenforceability." D.I. 424 ¶ 1. Chervon disagrees. Chervon contends that One World's inequitable conduct allegations fail as a matter of law. *See* D.I. 410 at 4-16; D.I. 442 at 1-12. As discussed below, the Court denies the No Inequitable Conduct Motion.

### 1.    Inequitable Conduct Legal Standard

"Inequitable conduct renders a patent unenforceable and is, therefore, an affirmative defense to an allegation of patent infringement." *Luv n' Care, Ltd. v. Laurain*, 98 F.4th 1081, 1096 (Fed. Cir. 2024); *see GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1324 (Fed. Cir. 2020). "It is important to note that inequitable conduct is an equitable claim that is triable to the court, not to the jury." *Lipocine Inc. v. Clarus Therapeutics, Inc.*, No. CV 19-622-WCB, 2020

WL 4794576, at *7 (D. Del. Aug. 18, 2020).[3] "Unlike validity defenses, which are claim specific, inequitable conduct regarding a single claim renders the entire patent unenforceable." *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1350 (Fed. Cir. 2017).

"To prove inequitable conduct, a party must show that the patentee withheld material information from the PTO, and did so with the specific intent to deceive the PTO." *Luv n' Care*, 98 F.4th at 1096-97. "Both requirements must be proven by clear and convincing evidence. Moreover, deceptive intent must be the single most reasonable inference based on the evidence." *Luv n' Care*, 98 F.4th at 1097 (citation omitted).

"To prove the element of materiality, a party claiming inequitable conduct ordinarily must show that the patentee 'withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing.'" *Ohio Willow Wood Co. v. Alps S., LLC*, 813 F.3d 1350, 1357 (Fed. Cir. 2016) (quoting *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333 (Fed. Cir. 2013)).[4] "In determining the materiality of a reference [or information], the court applies the preponderance of the evidence standard and gives claims their broadest reasonable construction." *Regeneron Pharms.*, 864 F.3d at 1350. "[T]he analysis of this *but-for* materiality requirement is from the perspective of the PTO." *Ohio Willow Wood*, 735 F.3d at 1345; *see Regeneron Pharms.*, 864 F.3d at 1351 ("Determining but-for materiality requires that the court place itself in the shoes of a patent examiner and determine

---

[3] "Where there are overlapping factual issues that relate to a claim tried to a jury and a claim to be resolved by the court, the court must defer to the jury's finding on any overlapping factual issues." *Natera, Inc. v. ArcherDX, Inc.*, 690 F. Supp. 3d 437, 448 n.5 (D. Del. 2023).

[4] "In setting forth its test for materiality, *Therasense* contemplated statements made to the PTO during initial prosecution of a patent. But statements critical to the 'survival of the patent'—even though they do not, strictly speaking, bear on patentability—also can be material within the meaning of *Therasense*." *In re Rembrandt Techs. LP Pat. Litig.*, 899 F.3d 1254, 1273 n. ** (Fed. Cir. 2018) (citation omitted).

whether, had the reference(s) been before the examiner at the time, the claims of the patent would have still issued.").

"'[I]n cases of affirmative egregious misconduct,' materiality is established per se, without need to prove its impact on the PTO's patentability determination." *Luv n' Care*, 98 F.4th at 1097 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc)); *see, e.g.*, *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1342 (Fed. Cir. 2013); *Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1362 (Fed. Cir. 2014) (dicta); *Baxalta Inc. v. Bayer Healthcare LLC*, No. CV 17-1316-RGA-SRF, 2020 WL 5445375, at *8 (D. Del. July 13, 2020). Accordingly, if the movant argues that materiality is established via "affirmative egregious misconduct," then the fact finder should "ma[k]e findings as to affirmative egregious misconduct and per se materiality." *Luv n' Care*, 98 F.4th at 1097.

"To satisfy the intent requirement, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it. Inequitable conduct requires clear and convincing evidence of a specific intent to deceive the PTO and that the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1353 (Fed. Cir. 2021) (cleaned up). "Specific intent to commit acts constituting inequitable conduct may be inferred from indirect and circumstantial evidence." *Ohio Willow Wood*, 813 F.3d at 1358. The "purposeful omission or misrepresentation of key teachings of prior art references may . . . be indicative of a specific intent to deceive the PTO." *Luv n' Care*, 98 F.4th at 1099.

"Acts which are not 'per se unreasonable when considered in isolation' may still demonstrate 'repeated attempts to avoid playing fair and square with the patent system' and,

collectively, support a finding of deceptive intent." *Id.* at 1098 (quoting *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223 (Fed. Cir. 2007)). "Because an intent to deceive the PTO can be inferred from a person's 'pattern of lack of candor,' a district court must consider the person's multiple acts of misconduct '[i]n the aggregate.'" *Id.* at 1098 (alteration in original) (quoting *Apotex*, 763 F.3d 1354). Thus, "[w]hen a person having a duty of candor and good faith has engaged in serial misconduct during the prosecution of the same or related patents, it is not enough for a court to consider each individual act of misconduct without also considering the collective whole." *Luv n' Care*, 98 F.4th at 1098.

With respect to inequitable conduct determinations, the role of expert testimony is limited. *See W. R. Grace & Co.-Conn. v. Elysium Health, Inc.*, No. CV 20-1098-GBW, D.I. 291 at 4-7 (D. Del. Aug. 3, 2023) (surveying Court's caselaw on expert testimony in patent cases, including inequitable conduct); *Persawvere, Inc. v. Milwaukee Elec. Tool Corp.*, No. CV 21-400-GBW, 2023 WL 8019085, at *14-15 (D. Del. Nov. 20, 2023). Generally, "experts in patent cases may not opine on whether a party engaged in inequitable conduct, discuss whether certain information was material to a pending patent application, or otherwise provide legal conclusions on 'substantive issues of patent law.'" *Elysium Health*, No. CV 20-1098-GBW, D.I. 291 at 6 (quoting *Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, No. CV 8-464, 2010 WL 3907490 (D. Del. Sept. 21, 2010)). That is not to say, however, that expert testimony is per se irrelevant to the issue of inequitable conduct.[5]

"Notably, granting summary judgment of no inequitable conduct 'is permissible, but uncommon,' in light of the 'inherently factual nature of the issue of intent.'" *EIS*, 2023 WL

---

[5] *See, e.g., Persawvere*, 2023 WL 8019085, at *14-15; *EIS, Inc. v. IntiHealth Ger GmbH*, No. CV 19-1227-GBW, 2023 WL 6799332, at *6 (D. Del. Aug. 23, 2023); *Regeneron Pharms.*, 864 F.3d at 1351-56.

6799332, at *5 (quoting *Digital Control, Inc. v. Charles Mack Works*, 437 F.3d 1309 (Fed. Cir. 2006)). While granting summary judgment of no inequitable conduct may be uncommon, it does happen on occasion.[6]

## 2.    Summary of Pertinent Facts

"One World alleges inequitable conduct by prosecution counsel and at least inventor Fangjie Nie [('Inventor Nie' or 'Mr. Nie')] during prosecution of the patent applications that issued as" U.S. Patent Nos. 9,596,806, 9,826,686, 9,986,686, and 10,070,588. D.I. 424 ¶ 1.[7] Moreover, "One World contends that the related [U.S. Patent No. 10,485,176] and [U.S. Patent No. 10,477,772] patents are unenforceable under the doctrine of infectious unenforceability." D.I. 424 ¶ 1.[8] As discussed below, the principal doers of bad deeds, according to One World, are: Inventor Nie, Gary Jarosik, and Keith Jarosik. *See* D.I. 423 at 4-10; D.I. 424 ¶¶ 1, 12, 16.

### a.    One World's Theory of Inequitable Conduct

One World "allege[s] that, during the prosecution of some of the asserted patents, the patent applicants and the prosecuting attorneys withheld a material figure from a prior art publication with an intent to deceive the patent office." *Chervon (HK) Ltd. v. One World Techs., Inc.*, No. CV 19-1293-GBW, 2022 WL 14812531, at *1 (D. Del. Oct. 26, 2022). European Patent Application

---

[6] *See, e.g., U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345, 1353-54 (Fed. Cir. 2016); *Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, No. CV 20-464-WCB, D.I. 283 at 43 (D. Del. Mar. 27, 2023); *Extang Corp. v. Truck Accessories Grp., LLC*, No. CV 19-923-KAJ, D.I. 228 at 2, 2022 U.S. DIST. CT. MOTIONS LEXIS 626162 (D. Del. Feb. 8, 2022) (order granting motion for partial summary judgment).

[7] The parties refer to these patents collectively as the "IPR Patents," and respectively as follows: the '806 patent, the '26686 patent, the '86686 patent, and the '588 patent. *See* D.I. 409 ¶¶ 1-2; D.I. 410 at 1; D.I. 423 at 5, 32.

[8] The parties refer to these patents, respectively, as: the '176 patent and the '772 patent.

No. 0903074 ("Outils" or the "Outils Application") is central to that allegation.[9]  Specifically, One

World contends that figure 10 of the Outils Application, which is reproduced below from a

translation of Outils FR, is "material to the asserted patents" and was "intentionally withheld . . .

from the Patent Office for years":



D.I. 423 at 4 (quote); ECF No. 428-2 at PageID 26010 (figure); *see* D.I. 423 at 3 ("Outils Figure

10[] [] would have caused the examiner to reject [Chervon's] claims."), 13 ("One World will prove

---

[9] "Exhibit A [(D.I. 428-1)] [] is European Published Application EP 0903074A1, published March 24, 1999, by applicant Outils Wolf Societe Anonyme (as referenced in One World's Response brief, 'Outils'), as well as its French counterpart, French Republic Patent Application FR 2 768 300 A1, published March 19, 1999, by applicant Outils Wolf Societe Anonyme ('Outils FR')." D.I. 428 ¶ 3.  "Exhibit B [(D.I. 428-2)] [] is the certified translation of Outils FR."  D.I. 428 ¶ 4.

at trial that Outils figure 10 is but-for material to patentability.") (capitalization and emphasis altered).

One World contends that its "expert Mr. Reed opines, with detailed evidence and analysis, that Outils Figure 10 would invalidate the asserted claims, and the PTAB's institution decision confirms that Figure 10 would have impacted the examiner's decision during prosecution." D.I. 423 at 13; *see* D.I. 424 ¶ 32. Specifically, One World contends that "Mr. Reed demonstrates how Outils Figure 10 in combination with other prior art invalidates the asserted claims." D.I. 423 at 13; *see, e.g.*, D.I. 428-27 (invalidity chart, where Outils FR is the primary reference); D.I. 428-28 (invalidity chart, where Outils FR is the secondary reference); D.I. 428-29 (invalidity chart, where Outils FR is a secondary reference); D.I. 428-30 (invalidity chart, where Outils FR is a secondary reference); D.I. 428-31 (invalidity chart, where Outils FR is the primary reference).[10]

As illustrated below, One World contends that "Outils Figure 10 is strikingly similar to Figure 8 of the '588, '806, '26686 and '86686 patents" (D.I. 423 at 13):



| Outils Figure 10 (annotated) | '588 Patent Figure 8 (annotated) |

---

[10] The claim charts are found in appendices to Mr. Reed's opening invalidity report. *See* D.I. 428 ¶¶ 29-33.

D.I. 423 at 14. According to One World, the similarity between the preceding figures matters, because figure 10 of the Outils Application discloses "[t]he position and function of [a] 'second control device' [that] is critical to the claims." D.I. 423 at 14.

Moreover, One World contends that the materiality of figure 10 is bolstered when considering how others have characterized it. For example, One World contends that Inventor "Nie prepare[d] an invention record that shows Outils' figure 10 is material to the inventions." D.I. 423 at 5 (capitalization and emphasis altered); *see* D.I. 428-4 (translated copy of the "invention record").[11] Additionally, One World contends that "the PTAB confirm[ed] that Outils figure 10 is material to patentability." D.I. 423 at 10 (capitalization and emphasis altered).[12] One World also contends that "[t]he PTAB . . . found . . . that Outils discloses the control system, second control device, and first control device limitations." D.I. 424 ¶ 8.

As to intent, One World contends that Inventor "Nie and his lawyers intentionally withheld Outils Figure 10 from the Patent Office for years." D.I. 423 at 4. One World contends that Chervon has manufactured a "far-fetched" story about why the figure was omitted. *See* D.I. 423 at 6-10, 18-22; *see also* D.I. 424 ¶ 17. According to One World, after Chervon sent a digital copy of Outils to Gary Jarosik, a coworker of Gary Jarosik had the digital copy printed and then a separate coworker was asked to scan the printed copy to create another digital copy. *See* D.I. 423 at 19. One World speculates that this print and scan scheme occurred for the purpose of

---

[11] "Exhibit D [(D.I. 428-4)] [] is a certified translation of the Chervon Invention Record, Bates No. CHERVON 0253065 - CHERVON 0253071." D.I. 428 ¶ 6.

[12] One World supports this contention by pointing to language in the PTAB's institution decisions. *See* D.I. 423 at 10-11, 14. In the PTAB's "preliminary institution decisions in the *inter partes* review of some of the asserted patents, the PTAB noted that the withheld figure in the prior art publication was 'particularly relevant.'" 2022 WL 14812531, at *1 n.1. One World contends that "the Final Written Decisions in the IPRs do not detract from the PTAB's finding of materiality." D.I. 423 at 11.

introducing an intentional "scanning error," whereby figure 10 would be omitted. *See* D.I. 423 at 19-20; *see also* D.I. 424 ¶ 19.

**3.      Analysis**

Chervon contends that, as a matter of law, One World's inequitable conduct defense fails for two independent reasons: (1) because the Outils Application purportedly lacks but-for materiality (D.I. 410 at 4-9); and (2) because One World purportedly "cannot prove that [Chervon] had a specific intent to deceive the PTO." D.I. 410 at 9 (capitalization and emphasis altered). "[S]ummary judgment is appropriate only if, construed in the light most favorable to the non-moving party, the record shows that there is no genuine dispute of material fact[, as to materiality or intent,] and that the moving party is entitled to judgment as a matter of law." *Qin v. Vertex, Inc.*, 100 F.4th 458, 469 (3d Cir. 2024). As discussed below, with respect to the Outils Application, Chervon has not shown that summary judgment of no inequitable conduct is warranted due to insufficient materiality or intent.

**a.      Materiality**

As to materiality, at this stage, the Court is not convinced of Chervon's contention that "[t]here is no genuine dispute that Outils' fig. 10 is not but-for-material." D.I. 410 at 4 (capitalization and emphasis altered). "Materiality is a question of fact." *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, No. CV 17-1734-RGA, 2021 WL 982728, at *2 (D. Del. Mar. 16, 2021); *see Creo Prod., Inc. v. Presstek, Inc.*, 166 F. Supp. 2d 944, 974 (D. Del. 2001), *aff'd*, 305 F.3d 1337 (Fed. Cir. 2002). Given the procedural posture, as "[t]he moving party[,] [Chervon] bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact," with respect to the materiality of the Outils Application. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015); *see United States v. Care Alternatives*, 81 F.4th 361,

375 (3d Cir. 2023) ("[I]t is the *moving party* who bears the burden of demonstrating the absence of a genuine issue of material fact.").[13]

Chervon provides two independent grounds to support its contention that figure 10 of the Outils Application lacks the required materiality. First, Chervon contends that "[t]he PTAB's final written decisions confirm that Outils' fig. 10 is not but-for material as a matter of law." D.I. 410 at 4 (capitalization and emphasis altered); *see id.* at 7 ("The PTAB considered the allegedly but-for material Outils' Fig. 10 during the IPRs that Defendants filed and conclusively held in the FWDs that the PTO correctly allowed the claims of the IPR Patents over Outils and its Fig. 10.").[14] One World disagrees. One World contends that "[t]he PTAB did not conclude that Outils was not material or that it could not be invalidating in other combinations." D.I. 423 at 16. As discussed below, district courts have taken different approaches to inequitable conduct challenges that are based on references that were already raised in unsuccessful, post-issuance challenges, such as inter partes reviews and *ex parte* reexaminations.

As Chervon highlights, *see* D.I. 410 at 5-7, some courts outside this District have precluded inequitable conduct challenges that are based on references that were already raised in unsuccessful, post-issuance challenges. *See Terves, LLC v. Yueyang Aerospace New Materials Co.*, No. CV 19-1611, 2022 WL 1092658, at *7 (N.D. Ohio Apr. 12, 2022) ("Because the USPTO confirmed patentability with full knowledge of all of the materials Ecometal alleges were wrongfully withheld during the initial determination of patentability, those materials cannot be

---

[13] "[F]or a factual dispute to be material, its resolution must have the potential to affect the outcome of the suit." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022). "[I]n assessing the genuineness of a potential factual dispute, inferences from the underlying facts should be drawn in favor of the nonmoving party." *Id.* at 204.

[14] Chervon previously presented this contention in a motion to strike. *See* 2022 WL 14812531, at *2 n.2, 3.

deemed to have been material. . . . The fact that both the original and reexamination examiners made the same decision, one with and one without the information at issue, precludes a finding that the information was material."). Other courts have treated those challenges as imposing a heavy burden on the party alleging inequitable conduct. *See Illinois Tool Works Inc. v. Termax LLC*, No. CV 20-5416, 2023 WL 4707263, at *8 (N.D. Ill. July 24, 2023) (citation omitted) ("[T]he PTAB's later refusal to institute IPR proceedings is strong evidence that the Scroggie reference was not but-for material. Since the PTAB found that the Scroggie reference did not anticipate the D'826 Patent—rejecting arguments Termax repeats before this Court—Termax must battle uphill to plausibly allege that the PTO would have found the D'826 Patent unpatentable over the Scroggie reference. Termax is correct that the PTAB's refusal to institute IPR does not, as a matter of law, preclude it from demonstrating the Scroggie reference's materiality."). Some courts have treated such challenges as one piece of evidence to consider when reaching "an independent conclusion regarding materiality." *Jaguar Land Rover Ltd. v. Bentley Motors Ltd.*, No. CV 2:18-320, 2021 WL 755479, at *4 (E.D. Va. Feb. 16, 2021) ("However, despite the presumption of validity and the associated deference that the Court grants the PTAB's decision, the Court must still reach an independent conclusion regarding materiality and in doing so, would have to consider the underlying merits of Bentley's evidence and the PTAB's decision.").

Before *Therasense*, this Court noted that "the Federal Circuit has explained, 'the result of a PTO proceeding that assesses patentability in light of information not originally disclosed is of strong probative value in determining whether the nondisclosed information would have been material.'" *Applera Corp. v. Micromass UK Ltd.*, 204 F. Supp. 2d 724, 760 (D. Del. 2002) (quoting *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553 (Fed. Cir. 1984)); *see id.* ("The PTO

Examiner's initial rejection of the claims of the '736 patent in reexamination is strong evidence that the French application is material, but does not itself establish materiality as a matter of law.").

Post *Therasense*, this Court has rejected the view that unsuccessful, post-issuance challenges per se preclude all inequitable conduct challenges that are based on references that were already raised through post-issuance challenges. *See EIS*, 2023 WL 6799332, at *6-8; *Targus*, No. CV 20-464-WCB, D.I. 283 at 38-39; *cf. SunPower Corp. v. PaneClaw, Inc.*, No. CV 12-1633-MPT, 2016 WL 5107029, at *13 (D. Del. Sept. 19, 2016).  For example, in *EIS*, the Court held that "there exist genuine disputes of material fact regarding whether a complete translation of *Guan* is but-for material to the patentability of the Asserted Patents," despite the fact that "the PTAB considered a complete translation of *Guan* during IPR proceedings."  2023 WL 6799332, at *6-7. The *EIS* Court also emphasized that "the prior art obviousness combinations considered during the IPRs are not identical to those raised by EIS's technical expert" to support inequitable conduct. *Id.* at *6.

Here, applying *EIS* and *Targus*,[15] the Court is not convinced that One World's inequitable conduct challenge fails as a matter of law simply because the Outils Application was raised in unsuccessful IPR proceedings.  *See EIS*, 2023 WL 6799332, at *6-8; *Targus*, No. CV 20-464-WCB, D.I. 283 at 38-39.

---

[15] "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case." *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017) (alteration in original) (quoting *Camreta v. Greene*, 563 U.S. 692 (2011)).  Nevertheless, having reviewed Chervon's bulky string cite of out-of-district cases, *see* D.I. 410 at 5-7, the Court is not convinced that nonbinding precedent warrants departing from this Court's precedent. *Cf. Garza v. Citigroup Inc.*, 311 F.R.D. 111, 116 n.8 (D. Del. 2015), *aff'd*, 881 F.3d 277 (3d Cir. 2018); *In re Windhaven Top Ins. Holdings, LLC*, No. 21-1534-CFC, 2023 WL 2644000, at *5 (D. Del. Mar. 27, 2023).

Second, Chervon contends that "Outils' fig. 10 is not but-for material as a matter of law because it is cumulative of Outils' specification and claims." D.I. 410 at 8 (capitalization and emphasis altered); *see* D.I. 410 at 9 ("[I]t is undisputed by Defendants that Outils' Fig. 10 is cumulative of the Outils Translation."); ECF No. 406-3 at PageID 16771-16784.[16]  One World disagrees. One World contends that "Figure 10 is not cumulative of the translated text provided to the Patent Office during examination." D.I. 424 ¶ 32; *see* D.I. 423 at 10-11; ECF No. 428-47 at PageID 26894, 26896-901.

"A reference is cumulative when it teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Luv n' Care*, 98 F.4th at 1098 (quoting *Regeneron Pharms.*, 864 F.3d 1343); *see Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, No. CV 20-464-RGA, 2021 WL 2291978, at *5 (D. Del. June 4, 2021) ("[A] reference is cumulative if it only contains information that is already disclosed in the art given to the Patent Office."). "A prior art reference that is otherwise material 'is not but-for material if it is merely cumulative.'" *Luv n' Care*, 98 F.4th at 1098 (quoting *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976 (Fed. Cir. 2022)).

Factual disputes can preclude resolving whether a reference is cumulative before trial. For example, "[i]n *Digital Control, Inc.*, the Federal Circuit held that materiality was not properly decided at summary judgment due to disputes of fact pertaining to the prior art's teachings, including whether one patent was cumulative of another." *Ojmar US, LLC v. Sec. People, Inc.*, No. CV 16-04948-HSG, 2018 WL 1640126, at *6 (N.D. Cal. Apr. 5, 2018); *see Digital Control*, 437 F.3d at 1319 ("Because there are genuine issues of material fact as to what the Geller reference

---

[16] Chervon previously presented this contention when challenging "Magistrate Judge Fallon's January 28, 2021 oral order granting Defendants' motion for leave to amend to include an affirmative defense of inequitable conduct (D.I. 134)." D.I. 250; *see* D.I. 191 at 3.

teaches, and thus whether the Rorden patent is cumulative of the Geller patent, the issue of whether the failure to disclose the Rorden patent was a material omission was not properly decided at summary judgment."); *see also Ampex Corp. v. Eastman Kodak Co.*, 460 F. Supp. 2d 569, 570 (D. Del. 2006).

Whether figure 10 of Outils Application is cumulative of Outils' written description poses a close question of fact. In the patent context, "[t]he law only requires a drawing 'where necessary.'" *Internet Machines LLC v. Alienware Corp.*, No. CV 6:10-23, 2013 WL 4056282, at *9 (E.D. Tex. June 19, 2013); *see Danfoss Power Sols. Inc. v. DeltaTech Controls*, No. CV 16-3111-NEB, 2019 WL 1517615, at *3 (D. Minn. Apr. 8, 2019) ("[D]rawings are not always required."). "According to section 113, '[t]he applicant shall furnish a drawing where necessary for the understanding of the subject matter sought to be patented.'" *In re Hayes Microcomputer Prods., Inc. Pat. Litig.*, 982 F.2d 1527, 1536 (Fed. Cir. 1992) (alteration in original) (quoting 35 U.S.C. § 113)*; see* 37 C.F.R. § 1.437(a) ("Drawings are required when they are necessary for the understanding of the invention (PCT Art. 7).").

Here, the written description's text discloses certain information that is illustrated in figure 10 of Outils Application. However, as Justice Brennan observed in the First Amendment context, "[t]he adage that 'one picture is worth a thousand words' reflects the common-sense understanding that illustrations are an extremely important form of expression for which there is no genuine substitute." *Regan v. Time, Inc.*, 468 U.S. 641, 678 (1984) (Brennan, J., concurring in part and dissenting in part).

Considering that at this stage "all reasonable inferences from the record must be drawn in favor of the nonmoving party and [that] the court may not weigh the evidence or assess credibility," *Care Alternatives*, 81 F.4th at 369 (cleaned up), the Court finds that "the issue of whether the

17

failure to disclose [figure 10] [] [] was a material omission [is] not properly decided at [the] summary judgment" stage. *Digital Control*, 437 F.3d at 1319. "Thus, although the fact finder may eventually find that [materiality] [] has not been proven under the governing legal standard, at this time, 'granting summary judgment would require [the Court] impermissibly to 'weigh evidence or determine credibility questions.'" *Lindis Biotech v. Amgen Inc.*, No. CV 22-35-GBW, D.I. 300 at 13 (D. Del. Nov. 25, 2024) (citation omitted) (some alterations in original) (quoting *Clews v. Cnty. of Schuylkill*, 12 F.4th 353, 364-65 (3d Cir. 2021)).

**b.     Intent**

With respect to intent, the Court finds that Chervon has not shown that summary judgment is warranted. "[I]ntent to deceive [is] [a] question[] of fact." *Creo Prod.*, 166 F. Supp. 2d at 974; *see Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1368 (Fed. Cir. 2010) (Prost, J., dissenting) ("Both elements, materiality and intent to deceive, are questions of fact."). "At the summary judgment stage, the focus is whether [One World] ha[s] 'mustered sufficient evidence such that, at the trial stage, a factfinder *could reasonably conclude* that deceptive intent is the single most reasonable inference.'" *CAO Lighting, Inc. v. Gen. Elec. Co.*, No. CV 20-681-GBW, D.I. 347 at 5 (D. Del. Nov. 17, 2022) (quoting *Sysmex Corp. v. Beckman Coulter, Inc.*, No. CV 19-1642-JFB-CJB, 2022 WL 1503987 (D. Del. May 6, 2022)); *see Elysium Health*, No. CV 20-1098-GBW, D.I. 291 at 6.

"As the Federal Circuit explained in *M. Eagles*, '[i]ntent is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially when there is no good faith explanation for a nondisclosure.'" *Targus*, No. CV 20-464-WCB, D.I. 283 at 41 (alteration in original) (quoting *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335 (Fed. Cir. 2006)). "Such an inference frequently requires the court to make credibility determinations regarding the testimony of the witnesses." *Id.* at 41-42 (collecting cases). "As multiple courts

18

have observed, questions of intent and credibility are 'difficult to determine on summary judgment.'" *Id.* at 42 (quoting *Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. CV 2:15-478, 2017 WL 11455318 (E.D. Va. Apr. 13, 2017)); *see Thomas v. Tice*, 948 F.3d 133, 145 n.3 (3d Cir. 2020) (Greenaway Jr., concurring in part) ("[W]e have previously recognized that a party's state of mind is typically not a proper issue for resolution on summary judgment, because it is inherently a question of fact which turns on credibility.") (citations and quotation marks omitted).

As to intent, Chervon and One World disagree on several material facts and the inferences to be drawn from those facts. Chervon contends that One World "ha[s] [not] adduced [any] evidence from which a specific intent to deceive is the 'single most reasonable inference' to be drawn." D.I. 410 at 13. Chervon contends that "[t]he undisputed record demonstrates that prosecution counsel's paralegal made a scanning mistake when the paralegal scanned the printouts of Outils and the Outils Translation." D.I. 410 at 13; *see id.* at 4 ("Outils' Fig. 10 was mistakenly omitted during the original prosecution."), 10 ("[T]he omission of Outils' figures (including Fig. 10) was the result of a scanning mistake that applicant was unaware of during prosecution of the IPR Patents."); D.I. 442 at 1 ("[T]here is a mountain of evidence that any nondisclosure to the PTO was the result of a mistake and no evidence—direct, circumstantial, anything—that the applicant or its counsel intended to deceive the PTO."). Sitting at the base of Chervon's "mountain of evidence" is Keith Jarosik and his testimony that "the figures of Outils (including Fig. 10) were mistakenly not submitted as an attachment to the 8/29/16, IDS, due to paralegal C. Tapia's clerical scanning error." D.I. 409 ¶ 18; *see* D.I. 410 at 10; D.I. 442 at 10; ECF No. 406-1 at PageID 15011-012, 15015. One World disagrees.

One World responds that "Mr. Jarosik's testimony about this purported 'mistake' is not credible in view of the substantial circumstantial evidence of intent presented by One World." D.I.

424 ¶ 17; *see* D.I. 423 at 21 ("Chervon's 'excuse' is neither credible nor believable."). One World also responds that it "will move to ask that the factfinder draw an adverse inference due to Chervon's and Greenberg Traurig's destruction of the original pages that Ms. Tapia received from Mr. Jarosik, the allegedly erroneous scanned copy, and other materials Chervon and Greenberg Traurig failed to preserve from the prosecution files." D.I. 423 at 21.

After consideration, the Court is not convinced that summary judgment is warranted on the basis of intent or the lack thereof. Even assuming *arguendo* that One World lacks "direct" evidence to support the required intent,[17] the record "does not compel a determination of no inequitable conduct at the summary judgment stage of this case." *Targus*, No. CV 20-464-WCB, D.I. 283 at 41; *see Care Alternatives*, 81 F.4th at 375 ("[I]t is the *moving party* who bears the burden of demonstrating the absence of a genuine issue of material fact.").

"While the burden of proving intent is a heavy one,[18] [the Court] cannot conclude as a matter of law that [One World] cannot show that [] [Chervon] intended to deceive the PTO." *ART+COM Innovationpool GmbH v. Google Inc.*, 155 F. Supp. 3d 489, 503-04 (D. Del. 2016). At this stage, "all reasonable inferences from the record must be drawn in favor of the nonmoving party and the court may not weigh the evidence or assess credibility." *Care Alternatives*, 81 F.4th at 369 (cleaned up); *see Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017) ("Credibility determinations are for the factfinder and are inappropriate at the summary

---

[17] The Court disagrees with Chervon's broad statement that there is "no evidence—direct, circumstantial, anything—that the applicant or its counsel intended to deceive the PTO." D.I. 442 at 1.

[18] *See Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1242 (Fed. Cir. 2013) ("The facts of materiality and intent must be established by clear and convincing evidence, for, as stated in *Burlington Industries, Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed.Cir.1988), 'summary judgment that a reputable attorney has been guilty of inequitable conduct, over his denials, ought to be, and can properly be, rare indeed.'").

judgment stage."); *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1362 (Fed. Cir. 2002) ("[S]ummary judgment is inappropriate where, as here, a case may ultimately turn on the credibility of witnesses."). Thus, although the fact finder may eventually find that deceptive intent has not been proven under the governing legal standard, *see Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244, 1254 (Fed. Cir. 2024), at this time, "granting summary judgment would require [the Court] impermissibly to 'weigh evidence or determine credibility questions.'" *Clews*, 12 F.4th at 364-65 (quoting *Hill*, 411 F.3d 118).

For the foregoing reasons, Chervon has not met its burden to warrant granting it summary judgment for no inequitable conduct. Thus, the Court denies the No Inequitable Conduct Motion. *See, e.g., EIS*, 2023 WL 6799332, at *5; *CAO Lighting*, No. CV 20-681-GBW, D.I. 347 at 6; *Elysium Health*, No. CV 20-1098-GBW, D.I. 291 at 22.[19]

**B.    The Remaining Summary Judgment Motions Are Denied**

Given the Court's denial of Chervon's first ranked summary judgment motion, the Court denies Chervon's other summary judgment motions in accordance with its summary judgment motions ranking procedures. *See* D.I. 329 ¶ 4(d); *Lindis Biotech, GmbH v. Amgen Inc.*, No. CV 22-35-GBW, 2024 WL 4869579, at *4 (D. Del. Nov. 22, 2024).

**C.    The Court Denies the Daubert Motion**

Chervon's Daubert Motion is an omnibus motion that seeks to exclude testimony from both Dr. Steckel and Mr. Reed. As discussed below, the Court denies the Daubert Motion.

---

[19] Chervon's additional, related request that "[t]he Court should also grant summary judgment on [One World's] infectious unenforceability" also fails, as it depended on Chervon establishing that summary judgment of no inequitable conduct is warranted due to insufficient materiality or intent. *See* D.I. 410 at 15-16.

### 1.    The Choice-Based Conjoint Survey Testimony of Dr. Steckel

Chervon moves "to exclude Dr. Steckel's opinions relating to [Chervon's] survey expert's choice based conjoint ('CBC') survey." D.I. 410 at 42.[20]  As discussed below, the Court denies this request.

### a.    Summary of Pertinent Facts

Chervon's "survey expert, Dr. Samantha Iyengar, Ph.D., designed and implemented a CBC survey to 'measure the value that RYOBI purchasers and potential purchasers assign to certain RYOBI cordless electric lawn mowers with handle features associated with the patents at issue.'" D.I. 410 at 43 (quoting ECF No. 406-6 at PageID 18505).  "In response to Dr. Iyengar's report and certain portions of [Chervon's] original damages expert's report, [One World] designated Dr. Steckel as a rebuttal expert." D.I. 410 at 44. "Dr. Steckel's rebuttal report criticize[s] Dr. Iyengar's CBC analysis and [Chervon's] damages expert's reliance thereon." D.I. 410 at 45.

---

[20] A conjoint survey analysis involves using surveys to determine user preferences:

> Conjoint survey analysis is a methodology borrowed from the marketing world and has been used in patent cases to attempt to value a specific feature or characteristic using consumer surveys.  To perform a conjoint survey analysis, an expert typically designs a survey in which participants are presented with products (e.g., laptop computers) with different combinations of features (e.g., screen size, memory, processing speed, weight).  The participants are asked to pick which of the proposed products they like best.  The expert repeats this several times with different combinations of features to identify the trade-offs consumers are willing to make to attempt to determine how consumers value each of the features presented in the survey. . . .  Because conjoint survey analysis is designed to isolate the value of specific features, damages experts have used it to try to calculate damages when the patented technology is allegedly incorporated into one component or feature of a multi-component product.

William Lee & Mark A. Lemley, *The Broken Balance: How 'Built-In Apportionment' and the Failure to Apply Daubert Have Distorted Patent Infringement Damages*, 37 Harv. J. Law & Tech. 255, 316 (2024) (footnotes omitted); *see Inventist, Inc. v. Ninebot Inc.*, 651 F. Supp. 3d 1228, 1247 n.9 (W.D. Wash. 2023) (observing that conjoint survey analysis is "based on the principle that any product can be broken down into a set of attributes that ultimately impact users' perceived value of an item or service").

In its opening brief (D.I. 410), Chervon contends that "Dr. Steckel's CBC survey opinions are inadmissible because he did not review Dr. Iyengar's survey before offering his rebuttal opinions."[21] D.I. 410 at 46.[22] Specifically, Chervon asserts that "Dr. Steckel failed to review and analyze six videos shown to survey respondents as part of the CBC survey before offering his opinions." D.I. 410 at 43. One World disagrees. *See* D.I. 423 at 40 ("Dr. Steckel's opinions rebutting Dr. Iyengar's survey are based on reliable methods and therefore are admissible.").

One World contends that "[Dr. Steckel] and his team conducted a thorough review of Dr. Iyengar's reports, her survey, the written materials she provided to the survey recipients, and screenshots of the videos she showed the survey respondents." D.I. 423 at 40. Moreover, One World emphasizes that: (a) "Dr. Steckel's staff watched th[e] videos" at issue and (b) Dr. Steckel "relied on his staff's input and the screenshots of those videos to prepare his rebuttal opinions." D.I. 423 at 40; *see* D.I. 428-37 ¶ 6.[23]

**b.    Analysis**

Chervon contends that a rebuttal survey expert cannot criticize a survey, unless the expert has reviewed the entire survey, including any accompanying videos. *See* D.I. 410 at 46-47; D.I. 442 at 23-24. Chervon's strongest case is *Johns Hopkins Univ. v. Alcon Lab'ys, Inc.*, No. CV 15-525-SLR-SRF, 2018 WL 11424700, at *2 (D. Del. Apr. 5, 2018). *See* D.I. 410 at 46. In *Johns*

---

[21] In its reply brief, Chervon contends that "Dr. Steckel's failure to review the complete CBC survey renders his opinions on that survey inherently unreliable." D.I. 442 at 23. Chervon's opening brief, however, did not use the word "reliable" or "unreliable" when challenging Dr. Steckel's proffered testimony. "Arguments first made in reply briefs are forfeited." *In Re Novartis*, 2024 WL 4723274, at *4.

[22] During deposition, Dr. Steckel testified that he reviewed the videos prior to his deposition, but not before submitting his rebuttal report. *See* ECF No. 406-6 at PageID 18735.

[23] "Exhibit KK [D.I. 428-37] [] is the Declaration of Dr. Joel H. Steckel dated August 23, 2024." D.I. 428 ¶ 39.

*Hopkins*, "[i]n an effort to discredit the expert report of Alcon's expert, Dr. Edwin Ryan, which relied on PAT Surveys and MarketScope Reports, JHU produced a supplemental expert report from survey expert Charles Colby." 2018 WL 11424700, at *5 (citation omitted). "Mr. Colby revealed at his deposition that his review was limited to summary slide presentations of the survey data, as opposed to the survey questionnaires and underlying data." *Id.* at *6. Accordingly, "Alcon s[ought] to exclude the opinions of Mr. Colby as unreliable." *Id.* at *5. "Specifically, Alcon contend[ed] that Mr. Colby d[id] not apply a scientific methodology to support his premise, and he never reviewed the actual survey questions or answer choices as they were presented to the survey respondents." *Id.* at *5.

Ultimately, the magistrate judge in *Johns Hopkins* "recommend[ed] that the court grant Alcon's motion to exclude the opinions and testimony of Mr. Colby." *Id.* at *6. As "the purpose of Mr. Colby's opinion [was] to demonstrate the unreliability of the PAT Surveys and MarketScope Reports," the magistrate judge found that "Mr. Colby's admissions that he did not review the actual survey questions or answer choices in the questionnaire forms [was] dispositive." *Id.* at *6.

While Chervon's strongest case has superficial appeal, *Johns Hopkins* is readily distinguishable. In *Johns Hopkins*, the expert "Mr. Colby represent[ed] that he engaged in '[e]xamination of the survey questions and permitted responses,' which revealed '[m]ethodological flaws.'" *Id.* at *6 (some alterations in original). Mr. Colby's "argument [regarding methodological flaws], however, rest[ed] upon a fundamentally false premise." *Verizon Commc'ns, Inc. v. F.C.C.*, 535 U.S. 467, 519 (2002). "Mr. Colby revealed at his deposition that his review was limited to summary slide presentations of the survey data, as opposed to the survey questionnaires and underlying data." 2018 WL 11424700, at *6. Moreover,

"Mr. Colby admitted that the presentation slides d[id] not indicate whether the actual question is provided in the slide heading or whether what is provided is a summary or paraphrasing of the question presented." *Id.* at *6 (quotation marks omitted). Unlike Mr. Colby, Dr. Steckel's challenged testimony is not based on a false premise. Also, unlike the survey questions in *Johns Hopkins*, nothing in the record indicates that the videos at issue here are critical to any of the expert's challenged opinions. Here, Dr. Steckel opined that he could "evaluate the [] [] details of Dr. Iyengar's study," without personally viewing the videos. ECF No. 406-6 at PageID 18735.[24]

Even assuming *arguendo* that the videos are important to Dr. Steckel's challenged testimony, the Court would not exclude the testimony, as "Dr. Steckel's staff, who assisted with his report, reviewed the native videos and discussed them with Dr. Steckel." D.I. 423 at 41. "[I]t is well recognized that, '[a]n expert witness is permitted to use assistants in formulating his expert opinion.'"[25] "Where [an] expert [i]s directly involved with the research, analysis or drafting of the report, even with substantial assistance from a colleague or associate, his involvement in and knowledge of the report are matters of weight, not admissibility." *PNC Fin. Servs. Grp., Inc. v. Plaid Inc.*, No. CV 2:20-1977, 2024 WL 3691607, at *16 (W.D. Pa. Aug. 7, 2024) (alterations in original) (quoting *Shire Viropharma*, 2021 WL 1227097).

---

[24] Even assuming *arguendo* that "[t]he videos are critical to the CBC survey," D.I. 410 at 47, the Court is not convinced that the videos are critical to any of Dr. Steckel's conclusions.

[25] *Shire Viropharma Inc. v. CSL Behring LLC*, No. CV 17-414, 2021 WL 1227097, at *21 n.13 (D. Del. Mar. 31, 2021) (some alterations in original) (quoting *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002) (Posner, J.)); *see, e.g., Bledsoe v. FCA US LLC*, No. 416CV14024TGBRSW, 2022 WL 4596156, at *16 (E.D. Mich. Sept. 30, 2022) (collecting cases) ("Using staff to complete tasks and gather data relevant to the expert analysis is appropriate."); *Spintouch, Inc. v. Outform, Inc.*, No. SACV82100840DOCADS, 2022 WL 17363902, at *5 (C.D. Cal. Sept. 28, 2022) ("[E]xperts need not be percipient witnesses and may rely on assistants to formulate their opinions."); *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014) ("[A]n expert may rely on assistants . . . in formulating their own expert opinions.").

Here, accepting Chervon's description of the substance of the videos, *see* D.I. 410 at 44, the Court finds that One World has established that Dr. Steckel's reliance on his staff to review and summarize the videos was an appropriate use of assistants.  As One World notes, "Chervon is free to cross-examine Dr. Steckel at trial about his reliance on his staff's review of the videos." D.I. 423 at 40; *see* 2024 WL 3691607, at *16.

**2.    The Supply-Side Economics Testimony of Dr. Steckel**

Chervon moves to exclude Dr. Steckel's "economics-based opinions, including his [] conclusion that 'Dr. Iyengar's conjoint analysis and its use in the Milani Report fail to account for supply-side factors and competitive conditions.'"  D.I. 410 at 45 (quoting ECF No. 406-1 at PageID 18682).  As discussed below, the Court denies this request.

**a.    Summary of Pertinent Facts**

As noted above, Dr. Steckel submitted a "rebuttal report criticiz[ing] Dr. Iyengar's CBC analysis."  D.I. 410 at 45.  Chervon contends that "[t]he Court should exclude Dr. Steckel's testimony on supply-side economics issues because he is not qualified."  D.I. 410 at 47. Specifically, Chervon criticizes Dr. Steckel's qualifications with respect to paragraphs "19, 55-62, 65, [and] 73" of Dr. Steckel's rebuttal report.  D.I. 410 at 47.

In paragraph 19, Dr. Steckel opines that "Dr. Iyengar's conjoint analysis and its use in the Milani Report fail to account for supply-side factors and competitive conditions."  ECF No. 406-1 at PageID 18682.  In paragraphs 55-61, Dr. Steckel expands on his conclusion proffered in paragraph 19.  *See* ECF No. 406-1 at PageID 18713-16.  In paragraphs 62 and 65, Dr. Steckel discusses his opinion that "the Milani report's application of the Iyengar platform survey results relies on several unfounded assumptions and cannot be relied upon."  ECF No. 406-1 at PageID 18717-21 (capitalization and emphasis altered).  Lastly, in paragraph 73, Dr. Steckel concludes:

> Dr. Iyengar's conjoint analysis and its use in the Milani Report fail to account for supply-side factors and competitive conditions. Mr. Milani conflates two entirely different concepts: (1) willingness-to-pay (*i.e.*, how much consumers are willing to pay for an attribute or benefit); and (2) a price premium (*i.e.*, how much more consumers [] would have to pay for that same attribute in a competitive marketplace, or equivalently how much a company could increase their price when the attribute and benefit are included). Mr. Milani therefore misuses the results of the Iyengar Conjoint Survey.

ECF No. 406-1 at PageID 18726. Chervon contends that Dr. Steckel is unqualified to provide those preceding opinions, because "Dr. Steckel is a survey expert, not an economist." D.I. 410 at 48; *see* D.I. 442 at 24 ("Dr. Steckel is not an economist, and he cannot offer opinions on supply-side economics."). One World disagrees.

One World contends that "Dr. Steckel's opinion about what the CBC survey actually measured is [] not an economics opinion, but rather a survey criticism that will be helpful to the jury." D.I. 423 at 43. Moreover, One World asserts that Dr. Steckel's "opinions reflect known failings in conjoint survey analysis, and thus are fully within the expertise of a survey expert with a Ph.D. in marketing." D.I. 423 at 43.

One World filed a declaration from Dr. Steckel, in which Dr. Steckel attempts to buttress his qualifications.[26] *See* D.I. 428-37 ¶¶ 3-5 ("My course work for my advanced degrees included advanced courses related to statistics and economic principles, including supply-side economics and the analysis of competitive equilibria. . . . I have taught various marketing courses that covered statistics and economic principles. These courses involved teaching the role of supply and demand in determining market prices . . . . [M]y courses cover the importance of supply-side considerations

---

[26] Chervon contends that this "attempt to rehabilitate Dr. Steckel through a belated supplemental expert report is [] improper." D.I. 442 at 24. Given that Chervon "do[es] not explicitly ask the [C]ourt to disregard the [declaration] [and] provide case citation upon which the court could rely to do so," the Court will consider Dr. Steckel's declaration. *Delaware State Univ. v. Thomas Co., Inc.*, No. CV 15-1144-MPT, 2020 WL 6799605, at *10 (D. Del. Nov. 19, 2020).

in influencing consumer choices and market prices. . . . [M]y publications in peer-reviewed academic journals contain the application of microeconomic principles.").[27] Thus, One World concludes that "Dr. Steckel is more than qualified to testify about whether a survey has properly accounted for supply-side economics." D.I. 423 at 43; *see id.* at 45 ("Dr. Steckel's strong academic background in math, marketing, and statistics, including organizational buying behavior, qualify him to opine about how supply-side and competitive factors would have impacted Dr. Iyengar's survey.").

**b.    Analysis**

As Chervon challenges Dr. Steckel's qualifications,[28] the "[C]ourt 'must decide any preliminary question about whether [] [Dr. Steckel] is qualified.'" *United States v. Meehan*, 741 F. App'x 864, 874 (3d Cir. 2018) (nonprecedential) (quoting Fed. R. Evid. 104(a)); *see* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[I]t remains the case that other admissibility requirements in the rule (such as that the expert must be qualified and the expert's testimony must help the trier of fact) are governed by the Rule 104(a) standard.").

"As gatekeeper, a trial judge has [a] dut[y] [to] confirm the witness is a qualified expert." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020); *see Cohen v. Cohen*, ___F.4th___, No. 21-2997, 2025 WL 45704, at *2 (3d Cir. Jan. 8, 2025).

---

[27] During deposition, Dr. Steckel testified: "I would not say that I have a professional designation as an economist. I do have some knowledge and experience in economics, but I don't have a degree as an economist." ECF No. 406-6 at PageID 18732-33; *see id.* at PageID 18734 ("I'm not an economist.").

[28] "Qualification refers to the requirement that the witness possess specialized expertise." *Furlan v. Schindler Elevator Corp.*, 516 F. App'x 201, 205 (3d Cir. 2013) (nonprecedential) (quoting *Schneider*, 320 F.3d 396). "[T]he binary question whether an expert is or is not qualified to testify to a particular subject is analytically distinct, under Rule 702, from the more finely textured question whether a given expert's qualifications enhance the reliability of his testimony." *United States v. Mitchell*, 365 F.3d 215, 242 (3d Cir. 2004).

"Rule 702 of the Federal Rules of Evidence sets standards for an expert witness's qualification." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1302 (Fed. Cir. 2015).

"Federal Rule of Evidence 702 allows a witness 'who is qualified as an expert by knowledge, skill, experience, training, or education' to provide opinion testimony." *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 507 (D. Del. 2017) (quoting Fed. R. Evid. 702). The Third Circuit "ha[s] interpreted Rule 702's qualification requirement liberally."[29] "Although standards for qualifying experts are liberal, they do prohibit testimony by completely unqualified witnesses." [30] "At a minimum, 'a proffered expert witness ... must possess skill or knowledge greater than the average layman ....'" *Philips*, 2023 WL 8559025, at *1 (alterations in original) (quoting *Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998)).

---

[29] *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008); *see, e.g.*, *Carnegie Mellon*, 807 F.3d at 1302 ("The Third Circuit allows 'a broad range of knowledge, skills, and training to qualify an expert' as such."); *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055 (3d Cir. 1997) ("Rule [702] mandates a policy of liberal admissibility, both with respect to the substantive as well as the formal qualification of experts."); *Otsuka Pharm. Co. v. Zenara Pharma Priv. Ltd.*, No. CV 19-1938-LPS, 2022 WL 4365744, at *2 (D. Del. Sept. 21, 2022) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)) ("We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications.").

[30] David P. Leonard et al., *The New Wigmore: A Treatise on Evidence* §3.1 (3d ed. 2025 Cum. Supp.); *see, e.g.*, *Mhl Custom, Inc. v. Waydoo USA, Inc.*, No. CV 21-0091-RGA, 2023 WL 1765553, at *1 (D. Del. Feb. 3, 2023) ("Mr. Barry, who is a technical expert, has no qualifications to testify about economic issues. Mr. Barry's opinions about commercial success are excluded."); *Philips v. Telitiot Sols., Inc.*, No. CV 20-1708-CFC, 2023 WL 8559025, at *1 (D. Del. Dec. 11, 2023) ("[I]t cannot be said that Dr. Stoffel-Munck possesses skills or knowledge greater than the average layman with respect to ETSI. Dr. Stoffel-Munck is therefore not qualified under Rule 702 to offer expert opinions about ETSI, and I will not allow him to offer at trial the opinions disclosed in the challenged paragraphs of his reports."); *CAO Lighting, Inc. v. Gen. Elec. Co.*, No. CV 20-681-GBW, 2023 WL 1930354, at *13 (D. Del. Jan. 30, 2023) ("[A]ny non-technical opinions Dr. Shealy and Mr. Benya seek to provide on commercial success exceeds their technical expertise and is not permissible.").

Below the Court summarizes three Third Circuit opinions that address expert qualifications.[31]

An example of an unqualified expert is found in *Yazujian v. PetSmart*, 729 F. App'x 213 (3d Cir. 2018) (nonprecedential).[32]  In *Yazujian v. PetSmart*, "a hearing was held to determine whether Yazujian's purported retail management and store safety expert, Robert Loderstedt, was qualified to testify." *Id.* at 214.  "The District Court found that Loderstedt was not qualified as an expert in retail safety." *Id.* at 214.  "Yazujian argue[d] that the [d]istrict [c]ourt abused its discretion by precluding Loderstedt from testifying." *Id.* at 215.  Specifically, "[Yazujian] contend[ed] that [Loderstedt] was qualified as a retail safety expert to opine on the industry best practices when dealing with inclement weather." *Id.* at 215.  "[Loderstedt] claimed that his specialized knowledge and expertise were based on his review of over one hundred retail store manuals, and his time training under William Julio—a person who he claimed was an expert in retail safety—which included visits to retail stores where he would walk in and look around." *Id.* at 216.

Ultimately, the *Yazujian v. PetSmart* panel "conclude[d] that the [d]istrict [c]ourt did not abuse its discretion in declining to permit Loderstedt to testify as an expert witness in retail safety." *Id.* at 215-16.  Moreover, the panel "agree[d] with the [d]istrict [c]ourt that Loderstedt was not qualified as an expert in retail safety." *Id.* at 216.  In affirming the district court, the Third Circuit

---

[31] In reviewing these opinions, the Court is mindful that "[the Third Circuit] review[s] [a] [d]istrict [c]ourt's decision to qualify [experts] for abuse of discretion." *Elcock v. Kmart Corp.*, 233 F.3d 734, 740-41 (3d Cir. 2000); *see Waldorf*, 142 F.3d at 627 ("[A] trial court's determination whether to admit or exclude expert testimony will be upheld 'unless manifestly erroneous.'").

[32] "While [*Yazujian v. PetSmart*] is nonbinding, *see id.* at 1 n.*[ ], it 'provide[s] guidance and persuasive reasoning.'" *Trotter v. Akinbayo*, No. CV 20-336-GBW-CJB, 2024 WL 5245248, at *6 (D. Del. Dec. 30, 2024) (some alterations in original) (quoting *W. R. Berkley Corp. v. Nolan*, No. CV 22-1537-GBW, 2024 WL 4604863 (D. Del. Oct. 29, 2024)).

highlighted that "Loderstedt had no academic background in retail safety, no formal training in retail management or safety, and no retail work experience other than a job as a stock clerk more than 50 years prior." *Id.* at 216.

An example of a qualified expert is found in *Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008). In *Pineda v. Ford Motor Co.*, "[i]n order to satisfy his burden of proof on [] products liability claims, Pineda retained Craig D. Clauser, P.E., as an expert." 520 F.3d at 241. "The [d]istrict [c]ourt granted [a] motion for a *Daubert* hearing[,] . . . . [at which] Clauser was the only witness to testify." *Id.* at 242. At that hearing, "Clauser admitted that he was not a warnings expert, except to the extent that 'a warning and instructions' are 'solution[s] to an engineering problem.'" *Id.* at 242 (alteration in original). "Primarily on this basis the [d]istrict [c]ourt found that Clauser was not qualified as an expert as required by Rule 702." *Id.* at 244; *see id.* at 244-45 ("The Court found that Clauser was not qualified to testify by primarily relying on Clauser's own statement at the *Daubert* hearing that he did not offer himself as a warnings expert.").

Ultimately, the *Pineda v. Ford Motor Co.* panel "h[e]ld that Clauser should have been qualified as an expert even though he may not have been the 'best qualified' expert or did not have the 'specialization' that the [d]istrict [c]ourt deemed necessary." *Id.* at 245. In doing so, the panel highlighted "Clauser's extensive formal qualifications." *Id.* at 245. The panel then proceeded to consider Clauser's "substantive qualifications." *Id.* at 245.

First, the *Pineda v. Ford Motor Co.* panel considered Clauser's substantive qualifications, with respect to his proffered "testi[mony] that a specific, step-by-step procedure was required in order to reduce the likelihood that the rear liftgate glass would fail when replacing the liftgate brackets and hinges on a 2002 Ford Explorer." *Id.* at 245; *see id.* ("More specifically, [Clauser] opined that such a procedure should have been embodied in an instruction in the 2002 Explorer's

service manual but was not."). The panel found that "[t]o meet Rule 702's liberal qualification requirement, Clauser did not need to be substantively qualified in the design of automobile rear liftgates or the drafting of service manual instructions." *Id.* at 245. The panel also found that "Clauser's expertise in the stresses and other forces that might cause a material such as glass to fail was more than sufficient to satisfy Rule 702's substantive qualification requirement." *Id.* at 245.

Second, the *Pineda v. Ford Motor Co.* panel considered Clauser's substantive qualifications, with respect to his "proffered [testimony] to establish that the 2002 service manual should have contained an explicit warning that following the necessary step-by-step instruction was a safety issue." *Id.* at 245. The panel emphasized the limited scope of Clauser's testimony: "as an engineer, Clauser did not purport to opine on how the warning should be worded or how it should appear in order to effectively convey its message to an automobile technician." *Id.* at 245. Clauser "only testified that neglecting to follow the steps of an instruction when replacing the 2002 Explorer's liftgate brackets and hinges might result in failure of the liftgate glass, and that a warning was necessary to alert a technician to the potential problem." *Id.* at 245. The panel found that "Clauser was substantively qualified to testify on this point because a proper warning is also a solution to an engineering problem." *Id.* at 245.

An example of a "district court [] not abus[ing] its discretion in qualifying" an expert is found in *Waldorf v. Shuta*, 142 F.3d 601, 627 (3d Cir. 1998).[33]  In *Waldorf v. Shuta*, "Waldorf [] argue[d] that he should receive a new trial because the district court improperly qualified Dennis

---

[33] The Third Circuit "consider[s] *Waldorf* [*v. Shuta*] to be at the outer limit of th[e] court's generally liberal approach to reviewing the qualifications of experts." *Elcock*, 233 F.3d at 744. The Third Circuit has "suspect[ed] that, had the district court in *Waldorf* [*v. Shuta*] ruled the witness unqualified, the panel would have affirmed." *Id.*

Rizzo, who testified for the Borough at trial, as an expert witness on vocational rehabilitation." *Id.* at 625. Rizzo's work experience included "working for the State of New Jersey in the Developmental Disabilities Council as a contract manager." *Id.* at 626. "In that capacity, Rizzo evaluated the capacity of disabled individuals to accomplish specific employment opportunities." *Id.* at 626. "Rizzo [] testified that, through the course of his employment, he became familiar with studies on the work that quadriplegics can perform." *Id.* at 626. "Furthermore in his job experience, Rizzo utilized the New Jersey Department of Labor Statistics and the New Jersey Job Listing Book, which indicate employment opportunities available in various job categories in New Jersey." *Id.* at 626. "The district court qualified Rizzo to testify as a vocational expert in spite of his lack of any formal training in that field, and notwithstanding that his educational training culminated in a master's degree in sociology and social organization from Rutgers University in 1973." *Id.* at 626. "[B]ased on [Rizzo's] experience and his familiarity with the literature in the field, the district court held that Rizzo was qualified properly as a vocational expert." *Id.* at 626.

Ultimately, the *Waldorf v. Shuta* panel "h[e]ld that the district court did not abuse its discretion in qualifying Rizzo as an expert witness." *Id.* at 627. In affirming the district court, the Third Circuit highlighted that "[e]ven though Rizzo did not possess formal academic training in the area of vocational rehabilitation, he did have experience in the field through his employment at the Developmental Disabilities Council in attempting to provide jobs for disabled individuals." *Id.* at 627. The Third Circuit also highlighted that "[e]ven if [Rizzo's] qualifications are, as the district court described, 'a little thin,' he has substantially more knowledge than an average lay person regarding employment opportunities for disabled individuals." *Id.* at 627. Lastly, the panel observed that "the jury heard all of the testimony regarding Rizzo's qualifications, and thus the jurors could evaluate the weight to give to Rizzo's expert opinions." *Id.* at 627.

Here, considering the preceding caselaw and considering Dr. Steckel's knowledge, skill, experience, training, and education, *see supra* Part III.C.2.a, the Court finds that One World has met its burden in establishing that Dr. Steckel is qualified to provide the challenged testimony in paragraphs 19, 55-62, 65, and 73 of his rebuttal report.

**3.     The Inequitable Conduct Testimony of Mr. Reed**

Chervon moves to exclude the "inequitable conduct opinions of Mr. Reed." D.I. 410 at 43. As discussed below, the Court denies this request with leave to renew.

**a.     Summary of Pertinent Facts**

Chervon contends that "Mr. Reed served approximately 70 pages of attorney advocacy disguised as expert opinion." D.I. 410 at 43. According to Chervon, Mr. Reed provides: (a) "several pages of law"; (b) "observations based on his review of the prosecution histories of the asserted patents and other related documents"; (c) "opinions about what the PTO hypothetically would have done had the applicant disclosed certain patent figures during prosecution"; (d) "facts relating to the prosecution histories of the patent"; and (e) "legal conclusions regarding materiality." D.I. 410 at 45.[34]

Chervon contends that "Mr. Reed's inequitable conduct opinions fail to meet all three benchmarks for admissible expert testimony and violate this District's well-settled law relating to the admission of expert testimony pertaining to inequitable conduct." D.I. 410 at 48; *see id.* at 49 ("Mr. Reed is not qualified to provide opinions on inequitable conduct."), 49 ("Mr. Reed's

---

[34] In a cursory footnote, Chervon requests that "[t]he Court [] [] not permit Mr. Reed to offer opinions about how to obtain a machine translation from [the] 'Espacenet' website." D.I. 410 at 49 n.33. "The court will not entertain requests for relief that are placed in footnotes." *Davis v. Spicer*, No. CV 21-874-SRF, 2023 WL 2498032, at *3 (D. Del. Mar. 14, 2023). Moreover, "[a]rguments raised in cursory footnotes are forfeited." *Realtek Semiconductor Corp. v. Avago Techs. Int'l Sales Pte. Ltd.*, No. CV 24-1235-GBW, D.I. 60 at 16 n.10 (D. Del. Dec. 11, 2024).

opinions are not the result of any methodology and would not help the jury."), 49 ("[T]he Court knows the law and does not need Mr. Reed to present opinions on inequitable conduct law.").

One World, however, contends that "Mr. Reed's technical opinions on materiality are proper and will assist the trier of fact." D.I. 423 at 45 (capitalization and emphasis altered). Specifically, One World asserts that it "will call its technical expert [Mr.] Reed—an expert on battery-powered lawnmower engineering—to opine about whether the figures of Outils, alone or in combination with other references, would invalidate the asserted claims and therefore would have been material to patentability." D.I. 423 at 45; *see id.* at 45-46 (citation omitted) ("Mr. Reed will opine about the technical aspects of the Outils reference from the perspective of a person of ordinary skill in the art, including whether the asserted claims would have been obvious to a person of skill in the art. Mr. Reed's analysis of the prosecution histories is an important factual predicate for his opinions about what the Outils reference discloses and how the Outils figures would render obvious the asserted claims.").[35]

**b.    Analysis**

"The Local Rules for this court provide, except in civil cases involving *pro se* parties, that every nondispositive motion shall be accompanied by an averment of counsel for the moving party that a reasonable effort has been made to reach agreement with the opposing party on the matters set forth in the motion." *Boyer v. Taylor*, No. CV 06-694-GMS, 2012 WL 1132786, at *5 n.5 (D. Del. Mar. 30, 2012) (citing D. Del. LR 7.1.1); *see* D.I. 329 ¶ 5. This requirement serves the purpose of "secur[ing] the just, speedy, and inexpensive determination of every action and proceeding."[36]

---

[35] One World represents that "Mr. Reed does not and will not opine about specific intent to deceive the Patent Office." D.I. 423 at 46.

[36] Fed. R. Civ. P. 1; *see, e.g., Buergofol GmbH v. Omega Liner Co., Inc.*, No. CV 4:22-04112-KES, 2024 WL 4291467, at *4 (D.S.D. Sept. 25, 2024) (cleaned up) ("Generally, the purpose of

Here, the movant represented that "a reasonable effort was made to reach agreement with opposing counsel regarding the subject matter of th[e] [Daubert] Motion," D.I. 404 at 1. However, the briefing makes clear that the parties can and should engage in a more meaningful meet and confer to discuss Mr. Reed's anticipated testimony in the trial to resolve One World's inequitable conduct defense. Thus, the Court denies Chervon's request with leave to renew after an additional meet and confer.[37]

4.    **The Ryobi BMM2400 and Gardena 34A Products Testimony of Mr. Reed**

Chervon moves "to exclude Mr. Reed from testifying or offering opinions regarding the physical Ryobi BMM2400 and Gardena 34A products." D.I. 410 at 43. As discussed below, the Court denies this request.

---

[] meet-and-confer requirement[s] is to force litigants to attempt to resolve, or at least narrow, the disputed issues to prevent the unnecessary waste of time and effort on any given motion."); *Equal Emp. Opportunity Comm'n v. Hooters of Am., LLC*, 347 F.R.D. 445, 449 (M.D.N.C. 2024) (quotation marks omitted) ("The purpose of [] meet and confer obligation[s] is to weed out disputes that can be amicably resolved without judicial intervention, thereby freeing the court's resources for the disputes that truly cannot."); *Dairy v. Harry Shelton Livestock, LLC*, No. CV 18-6357-RMI, 2020 WL 6269541, at *1 (N.D. Cal. Oct. 23, 2020) ("[T]he purpose of a meet and confer requirement is for the parties to engage in a meaningful dialogue about their respective positions on disputed issues to see whether they can resolve (or at least refine) the disputes without court intervention, saving time and money for the litigants as well as the court system.").

[37] Should Chervon seek to renew its request, after the Court issues a supplemental scheduling order for One World's inequitable conduct defense, Chervon shall file a letter with the Court within fourteen days. Chervon's letter must explain what efforts the parties took to reach agreement on the disputed testimony of Mr. Reed and clearly identify, using pinpoint citations, the specific testimony of Mr. Reed that remains in dispute.

a.     **Summary of Pertinent Facts**

The background section of Chervon's opening brief that corresponds to the Daubert Motion provides no information on Mr. Reed's proffered testimony regarding the Ryobi BMM2400 and Gardena 34A products.[38]  D.I. 410 at 43-45.[39]

The entirety of Chervon's corresponding argument section in its opening brief is reproduced below (D.I. 410 at 50):

> The Court should also not permit Mr. Reed to testify regarding the Ryobi BMM2400 and Gardena 34A products.  As discussed above, the primary references underpinning each of the Remaining Printed Publication Grounds are the Ryobi and Gardena Manuals.  (*See* Section II.A.3., *supra*.)  Mr. Reed does not rely on or cite to the Ryobi BMM2400 and Gardena 34A products, does not compare the Ryobi BMM2400 and Gardena 34A products to the Asserted Claims, and does not explain how the Ryobi BMM2400 and Gardena 34A products (as opposed to their product manuals) disclose, teach, or suggest any limitations of the Asserted Claims.  (SOF ¶ 84.)  Indeed, not a single photograph of the Ryobi BMM2400 and Gardena 34A products is included in Mr. Reed's report or charts.  (*Id.*)  Mr. Reed also admitted that he did not operate, test, or tear down the Ryobi BMM2400 and Gardena 34A products.  (SOF ¶ 85.)  The Court should *not permit* Mr. Reed to offer testimony about the Ryobi BMM2400 and Gardena 34A products when all the record evidence confirms that Mr. Reed cannot offer competent or reliable testimony about them.

One World represents that "Mr. Reed inspected the prior art Ryobi BMM2400 and Gardena 34A lawnmowers." D.I. 423 at 47.  One World also asserts that "Chervon's one-paragraph motion

---

[38] This Court's Local Rules generally require movants to accompany their motions with sufficient background information.  *See Lindis*, No. CV 22-35-GBW, D.I. 300 at 6 n.4.

[39] Elsewhere, in the context of its summary judgment motions, Chervon contends that "[One World] and [its] expert have failed to produce any record evidence or opinion relating to the structure or operation of the physical Ryobi BMM2400 and Gardena 34A products, and have failed to explain how the physical Ryobi BMM2400 and Gardena 34A products read on the Asserted Claims to render them obvious." D.I. 410 at 33-34; *see id.* at 35 ("Mr. Reed [] admitted that he did not operate, test, or tear down a Ryobi BMM2400 or Gardena 34A product."), 35 n.26 ("Defendants [] did not disclose any information relating to the physical Ryobi BMM2400 and Gardena 34A products in their interrogatory responses.").

to exclude Mr. Reed's invalidity opinions . . . is a poorly disguised fourth attempt to exclude these prior art lawnmowers from trial." D.I. 423 at 47.

**b.    Analysis**

As is evident from the discussion above, Chervon has put forward only a skeletal argument about why Mr. Reed's proffered testimony regarding the Ryobi BMM2400 and Gardena 34A products should be excluded under the *Daubert* standard. "As a general prudential rule, courts only decide issues that are fairly and fully presented." *ECB USA, Inc. v. Savencia, S.A.*, No. CV 19-731-RGA, 2020 WL 5369076, at \*4 (D. Del. Sept. 8, 2020). Thus, Chervon's request is denied. *See* 2020 WL 5369076, at \*4 ("[C]ursory arguments not fully developed by the parties are waived."); *Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 441 (D. Del. 2023) ("[A]rguments . . . not squarely argued[] are considered [forfeited].") (some alterations in original).

**IV.    CONCLUSION**

For the foregoing reasons, the Court **DENIES** Chervon's Motions.